**STATE of Missouri, Respondent,**

**v.**

**Junior Ernest GIBSON, Appellant.**

**No. 57196.**

Supreme Court of Missouri,
Division No. 1.

Dec. 10, 1973.

John C. Danforth, Atty. Gen., G. Michael O'Neal, Asst. Atty. Gen., Jefferson City, for respondent.

Jay White, Rolla, and J. W. Grossenheider, Lebanon, for appellant.

HIGGINS, Commissioner.

Junior Ernest Gibson, charged with assault on Minnie Gibson with intent to kill with malice aforethought, was convicted by a jury which assessed his punishment at two years' imprisonment. Sentence and judgment were rendered accordingly. § 559.180, RSMo 1969, V.A.M.S. (Appeal taken prior to January 1, 1972.)

Appellant does not question the sufficiency of evidence to sustain his conviction; and the evidence would permit the jury to find: that on May 18, 1970, at approximately 10 p. m., Minnie Gibson, estranged wife of defendant, left a tavern in St. James, Missouri, with Buster Farrell and Bobby Hopkins; that they got into Mrs. Gibson's automobile and left St. James, driving toward Highway U and the Interstate 44 overpass north and east of St.

James in Phelps County; that as she drove along her route, she noticed the blinking lights of a following automobile; that she thought someone was trying to stop her in connection with the needs of Bobby Hopkins's pregnant wife; that she made a left turn, crossed the overpass onto U, and pulled over to the right-hand side of the road and stopped; that when she stopped, the following car stopped behind her; that Bobby Hopkins left Mrs. Gibson's car, went back to the following car, and was shot to death by defendant; that Buster Farrell then went back to the following automobile and also was shot to death by defendant; that she remained in her car and defendant came to her car and fired one shot through the window into her face and one shot into her chest; that, although wounded, she was able to drive to a nearby house to get help. Such evidence made a case of assault with intent to kill with malice aforethought. § 559.180, supra.

Defendant's version was that he saw Minnie's car parked at the bar in St. James and he stopped to obtain evidence for his divorce suit then pending against Minnie; that when Minnie and her companions left, he followed; that when he saw they were not returning to town, he passed them and drove on toward the overpass; that Minnie then passed him and, when he arrived at the overpass, he saw Minnie's car and that she and her companions were out of the car blocking his way; that when he stopped behind her car and got out, the two men rushed him and knocked him against his car; that he then reached into his car, got his gun, and started shooting, killing both men; that Minnie got into her car and he thought she was reaching for a gun, so he shot her; that he went to his parents' home and reported the shootings to the authorities; that threats had been made previously on his life by Minnie and Buster. This version was the foundation for an instruction on defendant's right of self-defense by way of reasonable cause to apprehend a design by Minnie Gibson to kill or harm defendant.

Appellant contends (I) that the court erred in permitting Trooper Myers to give his opinion over defendant's objections on the location of the two cars at the time of the shooting and to testify that in his opinion Minnie's car did not block the path of defendant's vehicle "because Trooper Myers admitted that he was not present until after the cars had been removed and gave his opinion as to their location based on the physical evidence he observed at the scene and, therefore, this testimony was opinion evidence which invaded the province of the jury as to material facts affecting defendant's defense of self-defense and was, therefore, reversible error."

He argues that such opinion testimony of Trooper Myers, together with the statements of the court before the jury, and the leading and suggestive questions of the prosecuting attorney in the course of its admission "all of which indicated that the prosecuting witness's testimony should be believed rather than that of the defendant * * * deprived the defendant of a fair trial and constituted reversible error."

According to the prosecuting witness, Minnie Gibson, she drove across Interstate 44 via the overpass on Highway U and stopped her car in an intersection made by U and an access road which runs parallel to I–44. "I pulled over on the first right-hand road and that'; where I stopped * * * so that other people could go by." The following car "pulled behind us and stopped." The shootings followed.

According to defendant, when he got to the overpass, "they'd already crossed and had stopped with their car parked in the * * * easterly service road and the three of them were out in the road. I couldn't get by. I couldn't go the easterly road. I couldn't go the other way without running over anybody, so I stopped. * * * and when I stopped, I got out of my car. * * * And about that time Minnie said * * * 'Get him.'"

Trooper Don D. Myers of the Missouri State Highway Patrol was called by the

State and his testimony included the following:

"Q But from—looking at the scene, where did you determine that Minnie Gibson's car had been parked from the shooting? * * *

"MR. GROSSENHEIDER: * * * We're going to object to this as being speculative if he hasn't actually seen it parked there. * * *

"THE COURT: Well, he can give the factual things that he bases his opinion on. Overruled if he does that * * *.

"Q (by Mr. Z. White) The glass from the left door of the Gibson vehicle * * * indicated that the vehicle had been parked on the right side of the highway slightly north of the middle of the north outer road; in other words, it had been parked well in the intersection of the * * * connecting roads off of the traveling portion of Route U, would it? A In a northward—apparently in a northward direction. Q In other words, it would have been headed north along UU but would have been parked out of the traveled—either one of the traveling lanes of Route U? A Yes, that is correct. Q And to the east of Route U? A Yes. Q In—in an intersection of a crossroad? A That is correct.

" * * * Q Now, where did you place the defendant's vehicle during this shooting * * *?

"MR. GROSSENHEIDER: We object to that on the same ground. * * * THE COURT: Well, if he has factual information that he acquired there that he bases an opinion on he can give that.

"THE WITNESS: * * * there were tire marks turning to the left a short ways behind Minnie's vehicle, turning like the vehicle had been parked close to the rear of her vehicle, and when the vehicle left, the tire marks veered to the left and went across Route U and down the outer road in a westward direction. These tire marks matched the tire marks on Junior Gibson's vehicle.

"Q And was that the route that the defendant said he took when he left the area? A That is correct. * * * Q Now, from your examination * * * did Minnie Gibson's car have the road blocked at all?

"MR. GROSSENHEIDER: We object to that on the grounds that he didn't see the car parked there * * * and can only speculate as to where it was by the physical facts * * *. THE COURT: If he has some facts on which to base his opinion as to where it was, he can state what the facts were, then what his opinion is, based on those facts.

"Q The question was: * * * they asked you if he didn't tell you that they'd blocked the road on him and I'm asking you * * * if you saw any facts there that indicated that Minnie's car had the road blocked in any way, or if she was off of the road. * * *

"A From all of the physical evidence found at the scene, it was apparent that Minnie Gibson's vehicle had not blocked the highway in any manner, as far as Route U was concerned. It was apparent that the north service road, which runs in an east and west direction, would have been blocked by her vehicle, but not Route U, the highway on which the cars had been traveling on was not blocked.

"Q But would the pathway of Junior Gibson's car, coming from St. James on the south outer road, [have] been blocked?

"MR. GROSSENHEIDER: We object to that as repetitous. * * * THE COURT: * * * Overruled.

"THE WITNESS: Would you repeat that question, please? Q * * * Would * * * Junior Gibson's car, coming from St James, on the south outer road and turning onto UU, have been blocked by Minnie Gibson's car? A From the

tracks located at the scene it was apparent that Junior Gibson's car had been pulled onto the right edge of the highway, near the intersection also, and the vehicle would not have been blocked by Minnie Gibson's vehicle."

■ The foregoing demonstrates that Trooper Myers, who did not see the vehicles in question at the scene, was permitted to give his opinion, based upon physical facts found by investigation, on location of the vehicles in question and whether Mrs. Gibson's automobile had defendant's path blocked. This was akin to admitting a trooper's opinion on point of impact of two colliding automobiles based upon his judgment of location of debris, and is equally improper and erroneous. The subject is not a proper one for expert or opinion advice and the opinion given invaded the province of the jury. Hamre v. Conger, 357 Mo. 497, 209 S.W.2d 242, 248–249[9–10] (1948); Chester v. Shockley, 304 S.W.2d 831, 834[1] (Mo.1957). See also Housman v. Fiddyment, 421 S.W.2d 284, 290[6] (Mo. banc 1967). However, admission of the opinion of Trooper Myers was harmless in this case because the statement demonstrates that the opinion corroborated appellant's own testimony on the subject. State v. Baker, 185 S.W.2d 644, 645–646[2] (Mo.1945); State v. Forbus, 332 S.W.2d 931, 934[2] (Mo.1960). Consequently, there was no prejudice from the erroneous admission, and only prejudicial error is reversible error. State v. Mayberry, 272 S.W.2d 236, 240[6] (Mo.1954).

Appellant charges error (II) in permitting Trooper Myers to testify to the location of wounds of Farrell and Hopkins and the condition of Farrell's body because such testimony was irrelevant, immaterial, and inflammatory, tended to cause the jury to become biased and prejudiced against defendant, and did not tend to prove defendant's guilt of the assault on his wife.

It appears that Trooper Myers testified to his observation of a bullet wound in the head of both Hopkins and Farrell and the condition of Farrell's clothing, Farrell's body having been run over by defendant's car.

■ Appellant's contention is without merit because, under the charge, his intent to kill Minnie and whether it was with malice aforethought were necessary elements of the State's case. § 559.180, supra. Evidence of the head shots inflicted on both Hopkins and Farrell and the assault by automobile on Farrell's body, all interrelated to and in the "same transaction" as the assault on Minnie, was probative on those issues. State v. Lunsford, 338 S.W.2d 868, 872[4] (Mo.1960); State v. Varner, 329 S.W.2d 623, 628[7–9] (Mo. 1959). See also State v. Mosley, 22 S.W. 2d 784, 786[5] (Mo.1929); State v. Rasco, 239 Mo. 535, 144 S.W. 449, 461[17–19] (Mo.1912).

Appellant charges error (III) in failing to admit his Exhibit G which showed an assault on defendant charged against Farrell to which Farrell pleaded guilty as shown by defendant's admitted Exhibit F. He argues that "although the jury was permitted to learn [from F] that Buster Farrell * * * had been convicted of a crime—which was not the purpose of the offer—the jury was not permitted to see defendant's exhibit 'G', which showed that the crime was an assault upon Gibson, which had a strong bearing on Gibson's defense of self-defense."

■ Exhibit F was a part of the docket of the Magistrate Court of Dent County, Missouri, showing the case of State v. Buster Farrell, that he appeared in the case and entered a plea of guilty "for assaulting Junior Gibson." Accordingly, Exhibit F did show, contrary to appellant's assertion, that the crime there docketed was an assault by Farrell upon Gibson. Hence, the jury was permitted to know from F everything that the two exhibits together would show, and the court did not err in excluding G since it was, at most, cumulative to F.

Appellant charges error (IV) in refusing to permit his witness, Bill McDowell, to testify to conversations between the prosecuting witness, Minnie Gibson, and Buster Farrell concerning threats against the life of defendant. Appellant refers to several pages of the transcript of McDowell's testimony and argues that the proffered testimony consisted of both communicated and uncommunicated threats on defendant's life by both Farrell and Minnie, and was erroneously denied admission. He argues also that the testimony in question bore on the issue of Minnie's credibility.

◼ Examination of the transcript references shows that the alleged threats on her husband's life by Minnie Gibson and overheard by McDowell were admitted through McDowell's testimony, e.g., "she said, 'ought to kill the son-of-a-bitch [Junior] tonight.'" Only the threats made by Farrell and overheard by McDowell were excluded. Such exclusion was not erroneous because defendant was not on trial for any crime against Buster Farrell. He was on trial for the felonious assault of Minnie Gibson, and the threats, if any, made by defendant against Farrell had no probative value on defendant's fear of his victim, Minnie, or on who was the aggressor between defendant and Minnie. Holman v. State, 97 Okl.Cr. 279, 262 P.2d 456 (1953); 22A C.J.S. Criminal Law § 607 p. 415 (1961); State v. Lowry, 321 Mo. 870, 12 S.W.2d 469, 474[8] (1928).

Appellant makes similar contentions by Points V and VI. In V he asserts the court erred in refusing to permit witness John Gibson, son of Junior and Minnie, to testify to threats allegedly made against defendant's life by Farrell, Minnie, and Minnie's father, Robert Fanger. In VI he asserts error in the court's refusal to permit Fannie Gibson, defendant's mother, to testify to threats against defendant's life by Farrell and Minnie, and in refusal to permit Trooper Myers to testify to such threats being communicated to him.

As in Point IV, appellant refers to several pages of the transcript, this time covering the testimony of Fannie and John Gibson, to argue again that the proffered testimony was erroneously denied admission.

◼ The answer to these points is the same as that given to Point IV. John Gibson's testimony of threats made to him by Minnie against Junior's life was admitted, e.g., "she said that I better have him [Junior] stopped or that they were going to stop him one way or the other." The alleged threat that the court refused to admit was a threat by telephone allegedly communicated to Junior by Minnie and then related to John by Junior. Admission of the latter was properly refused because it was not John's first-hand knowledge but was hearsay. State v. Chamineak, 343 S. W.2d 153, 158[8, 9] (Mo.1961). The transcript references do not show any effort to elicit testimony from John Gibson to threats allegedly made on defendant's life by Farrell; and, if so, their admission would be properly denied because they would not be of probative value on the issues of who was the aggressor or whether defendant feared Minnie, his victim. The same would be true of the attempt to elicit testimony from John with respect to threats made upon defendant's life by Robert Fanger. Point IV, supra.

◼ Appellant's transcript references under Point VI do not show any effort to elicit testimony from Fannie Gibson to threats upon defendant's life allegedly made by Minnie; and for the reasons stated under Points IV and V, any evidence from Fannie of threats from Farrell are not probative on the issues of the assault charge. Refusal of testimony from Trooper Myers in the asserted respect would be proper because it is the same type of hearsay that made John Gibson's testimony under Point V inadmissible.

Appellant charges error (VII) in the court's refusal to admit evidence proffered by defendant on the reputation of the prosecuting witness for morality. Again, appellant makes extensive transcript references, this time to the testimony of Flora Zimmerman, called by the State as a rebuttal witness on the issue of the reputation of Minnie Gibson. She was asked, based upon what her associates say about her, "what Minnie's reputation is for truthfulness and being a peaceful, moral woman?" The answer was, "All right, I guess." The defense, in cross-examination, attempted to test the witness's opinion by questions suggesting that Minnie was an adulteress. The court sustained objection to such questions, and appellant now argues that the defense was erroneously restricted, particularly since the State had mentioned "morality" in its question to Mrs. Zimmerman.

■ Appellant recognizes "that proof of reputation for morality is not generally proper to impeach the testimony of a witness, State v. Lane, Mo., 371 S.W.2d 261," and one of appellant's transcript references shows that Mrs. Zimmerman did testify that she knew Minnie was living in adultery. In such circumstances, it may not be said that the court abused its discretion in its exercise of control over this aspect of cross-examination. State v. Stidham, 305 S.W.2d 7, 13[8] (Mo.1957); State v. Huff, 454 S.W.2d 920, 923[3] (Mo.1970).

Point VIII is, in part, another charge of error going to the court's refusal of testimony from John Gibson concerning threats on the life of his father by Farrell and Minnie's father, Robert Fanger. Such contention has been previously answered under Point V.

Point VIII also includes a charge of error in refusing testimony from John Gibson that Farrell possessed a pearl-handled gun and that he and Fanger were practicing to kill defendant with it.

■ Reference to the transcript shows that John never saw Minnie firing the gun, and, hence, whether Farrell or Fanger so engaged themselves is irrelevant and immaterial. Such did not tend to prove defendant to be in fear of Minnie or who was the aggressor between defendant and Minnie with respect to the charge on trial. Point IV, supra. It is noted that defendant, himself, testified that his son John "told me that they had a gun and had been target practicing with it, and that the Fangers was going to kill me with it." This admission cured the error, if any, in the refusal of the same thing from John Gibson. State v. Heard, 460 S.W.2d 570, 571[2] (Mo.1970).

■ Further under Point VIII appellant complains of the court's refusal of testimony from defendant that he was present during the deposition of Ralph Banks during which Banks communicated threats from Fanger and Minnie to him. This is more inadmissible hearsay. State v. Chamineak, supra; Point V, supra.

Appellant charges error (IX) in the court's refusal to discharge the jury upon defendant's request "because of the conduct of the prosecuting attorney in abusing, harassing and belittling defendant's counsel in front of the jury and by condoning such action rather than causing the prosecutor to conduct the trial in an orderly manner, because the jury was thus unduly influenced by the court and prosecutor to convict."

■ Appellant would support this point with numerous transcript references to trial incidents and court rulings. However, examination of those references together with the complete transcript does not reveal that the court abused its discre-

tion in control of the trial to defendant's prejudice. State v. Raspberry, 452 S.W.2d 169 (Mo.1970). Most of the referenced incidents involve somewhat heated exchanges between Zane White, the prosecuting attorney, and his brother, Jay White, one of defense counsel, in an emotion-packed trial. There was but one request for mistrial, and it was not accompanied by request for any less drastic relief.

Finally, appellant complains (X) that the court erred in examining defense witnesses, and "in lecturing and belittling the attorneys for the defendant in front of the jury." Again, appellant makes numerous references to the transcript and examination of them, together with the entire transcript, shows that they, at most, reflect disappointment of defense counsel when matters did not go their way and to their liking. The asserted "lectures" were generally entreaties to counsel to "proceed in an orderly manner," hardly an improper request in the tension produced by this trial, State v. Johnson, 454 S.W.2d 27, 30[4–6] (Mo.1970; and the trial court can question a witness, State v. Crockett, 419 S.W.2d 22, 27[10] (Mo.1967). The verdict, itself, indicates an absence of prejudice to the defendant in this trial where the charged assault and two interrelated murders were not disputed, and the only real issue was whether, in the circumstances, defendant acted in self-defense.

Judgment affirmed.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the Court.

All of the Judges concur.