STATE of Missouri, Respondent,

v.

Cornelius DODSON, Appellant.

No. 37584.

Missouri Court of Appeals,
St. Louis District,
Division Three.

Aug. 16, 1977.

Motion for Rehearing and/or Transfer
Denied Oct. 11, 1977.

James A. Bell, St. Louis, for appellant.

John D. Ashcroft, Atty. Gen., Paul Robert Otto, Philip M. Koppe, Asst. Attys. Gen., Jefferson City, George A. Peach, Circuit Atty., John D. Chancellor, Asst. Circuit Atty., St. Louis, for respondent.

GUNN, Judge.

A jury found defendant guilty of two counts of first degree murder and two counts of kidnapping. Defendant was sentenced by the trial court to two life sentences on the murder convictions and two ten year terms for the kidnappings, all to be served consecutively. A multitude of points has been raised on appeal, none of which is meritorious; we affirm the conviction.

Defendant has challenged the sufficiency of the evidence which requires us to dissertate on the facts. A grand jury, in a four count indictment, charged defendant and Billy Rabun of acting jointly in the commission of the kidnapping and murder of Sandra Smith and Kenneth Clay. Defendant's motion for severance of his trial from Rabun was granted, but his motion for separation of counts was denied.

The State's primary witness linking defendant to the crimes was 18 year old Karen Cravens,[1] an acknowledged heroin addict. It was her testimony that she and her boyfriend, Darryl Black[2] were making a search for some narcotics and were directed to 4136 Westminster in St. Louis as a place where narcotics could be purchased. On May 29, 1975, Ms. Cravens and Black were admitted into the house at 4136 Westminster and purchased some "buttons" of heroin which they injected into their systems. Cravens and Black remained on the Westminster premises throughout the day and evening of May 29 while a brisk narcotics sales operation took place.

During the course of the evening of May 29, Cravens, who was on the first floor of the house, heard an argument taking place between the two subsequent kidnapping and murder victims, Kenneth Clay and Sandra Smith. Billy Rabun, an alleged principal in the drug operation, then entered the house for the first time and went upstairs to be with Clay and Smith. About 20 minutes after Rabun had gone upstairs, Ms. Smith left the house claiming to have been injured, and Rabun and Clay took Ms. Cravens with them to look for her. When the threesome was unable to locate Ms. Smith, Ms. Cravens was taken back to 4136 Westminster where she spent the night.

The next morning, May 30, Ms. Cravens saw Rabun, Clay and Smith enter the house. Ms. Smith was weeping and protesting that she had not taken any money. Rabun was truculent. Directing his animus at Ms. Smith, he told her to "shut up," and with Clay took Ms. Smith upstairs. In the afternoon of May 30, Ms. Cravens went upstairs to a kitchen area where drugs were distributed to customers. She observed .

---

1. Ms. Craven's birth date was April 10, 1957.

2. Darryl Black was the father of Karen Craven's two children.

both Clay and Ms. Smith tied to chairs with their hands bound behind their backs. Ms. Cravens returned downstairs to participate in the bustling narcotics trade which was apparently not hampered by the nefarious activities upstairs. Rabun himself assisted by taking over Clay's assigned duty of dispensing narcotics after the latter's confinement.

Between one and four o'clock in the afternoon of May 30, the defendant arrived. He proceeded directly to the second floor. About an hour after defendant arrived, Ms. Cravens heard a moan from Ms. Smith upstairs. Then, at defendant's request, Ms. Cravens took a can of Drano to defendant. At that time she noted Rabun was present with defendant in the presence of Smith and Clay who were still tied to their chairs. Clay was now pleading for Ms. Cravens to vouch that he had not taken any money.

The day's activities apparently caused defendant and Rabun to be hungry, and they sent Ms. Cravens to purchase their evening meal. When she returned with the food, Ms. Cravens noticed that Clay was still tied to his chair but that Ms. Smith was lying motionless on the floor of another room. Cravens saw the defendant standing over Ms. Smith's body, smilingly admitting that he had strangled her to death.

A short time later, Ms. Cravens was again downstairs when she heard at least two shots fired. When defendant called for someone to come upstairs, Ms. Cravens complied and helped move Clay's dead body to a bed from the chair where it had been tied. Defendant and another person lifted Ms. Smith's body onto the same bed with Clay who was bleeding from the head. Ms. Smith's face and head were badly burned. After everyone left the room where the bodies of Clay and Smith had been deposited, defendant stated aloud and in no uncertain terms in the vernacular of his trade that he would kill anyone he caught defalcating with his money.

Defendant then offered Ms. Cravens the dead Clay's former job of distributing drugs to customers, which she accepted. Defendant stayed for a short period of time preparing quantities of drugs for sale.

After defendant and Rabun departed Ms. Cravens cleaned Clay's blood from the chair and floor. Sometime after midnight on May 31, the two men returned and wrapped each body in separate, colored blankets using wires and electrical cords as ligatures. As the blanket shrouded corpses were being carried outside, Rabun warned Ms. Cravens: "you haven't seen anything, you haven't heard anything."

The two bodies were found by police in the early morning of May 31, on a vacant lot in East St. Louis. The bodies were enclosed in the blankets described by Ms. Cravens and wrapped with wire and electrical cord as she had depicted. Smith's purse and Clay's wallet were found with the bodies with a .25 caliber shell casing inside Clay's blanket matching the casing later found at 4136 Westminster.

Cause of Clay's death was attributed to four .25 caliber bullets in his head. Ms. Smith had been strangled to death and had third degree alkaline chemical burns on her face, neck and shoulders. $125 was found in her vagina.

On June 1, 1975, St. Louis police, pursuant to a warrant, searched 4136 Westminster, ostensibly for the purpose of uncovering evidence of narcotics trafficking. The police also had reason to believe that they would find evidence relating to the murders of Clay and Smith, but the warrants were not obtained for that purpose. A contingent of approximately 20 police officers arrived at the house, and after making their presence and purpose known, entered. When police arrived upstairs Ms. Cravens and Black were flushing red capsules down a sink. Both were arrested for murder. All other persons in the house were arrested for narcotics possession. Neither defendant nor Rabun was present at the time of the search, but the defendant did arrive about two hours after the police first entered. He was arrested for murder, and Rabun was arrested shortly thereafter at his apartment.

Various narcotics and narcotics paraphernalia were seized and photographs of the

items as well as the items themselves were introduced at trial over defendant's objections. The partially dissolved red capsules and a .25 caliber shell casing were recovered from the sink drain pipe. The capsules were found to contain heroin, and the shell casing was determined to have been fired from the same weapon as the casing found with Clay's body.

Defendant's defense was an alibi that he was elsewhere at the time of the murders; that he had no connection with 4136 Westminster. The owner of the house, testifying for defendant, stated that she rented it to another person and that the defendant had no possessory interest in the property. Defendant's alibi witnesses were a bail bondsman testifying that on May 30, between 3 and 3:30 p. m., he had made bond for defendant on another charge. Defendant's sister and a girlfriend testified that they had been with defendant shortly after 3 o'clock at the courthouse when defendant was released on bond shortly after 3 p. m.; the girlfriend testified she spent the evening thereafter with defendant. The State's rebuttal testimony was from Circuit Judge Clyde Cahill, Jr. that he had signed defendant's bond on May 30 somewhere between 10:30 a. m. and 1:30 p. m. An assistant circuit attorney, testified that defendant left Judge Cahill's courtroom free on bond prior to 12:30 p. m. on May 30.

Defendant's first allegation of error is that he was unconstitutionally denied bail prior to trial thereby hindering the preparation of his defense. The specific allegation of prejudice is that he could not assist his counsel in locating alibi witnesses.

 Article I, § 20 of the Missouri Constitution guarantees: "That all persons shall be bailable by sufficient sureties, except for capital offenses, when the proof is evident or the presumption great." One charged with a non capital crime, therefore, may be admitted to bail as a matter of right with a few narrowly drawn exceptions. *Ex parte Burgess*, 309 Mo. 397, 274 S.W. 423 (banc 1925); *State ex rel. Corella v. Miles*, 303 Mo. 648, 262 S.W. 364 (banc 1924). The only legitimate purpose in setting bail is to ensure the accused's appearance at trial, and any amount in addition to that figure is excessive. *State v. Thompkins*, 515 S.W.2d 808 (Mo.App.1974); *Ex parte Chandler*, 297 S.W.2d 616 (Mo.App. 1957). Denial of bail prior to trial to inflict punishment on the accused would not only hamper the preparation of his case, but would render meaningless the presumption of innocence. *Stack v. Boyle*, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951). Bail is to be denied, therefore, only under the most compelling circumstances.

On June 27, 1975, defendant filed a motion to be admitted to reasonable bail. A hearing was held in which he was represented by counsel. At the time of the hearing, in addition to the four counts which are the subject of this appeal, defendant was also charged with and was awaiting trial on four other felony charges including one count of first degree murder. It was alleged that he had committed these most recent crimes while free on bail from the earlier charges. Defendant also had a prior conviction in 1973 for armed robbery and carrying a concealed weapon.

Defendant, testifying at the bail hearing, stated that he had been a resident of St. Louis his entire life (defendant was 23 years old at the time) and that his immediate family lived in the City as well. He stated that he had previously been released on bail on other charges, that he had always reported to court when directed, and that he had never forfeited bail. Defendant's bondsman testified that he had written four previous bail bonds for defendant and considered him a good bond risk.

Testifying for the State, Officer William Jones, a St. Louis policeman, related a portion of a conversation he had overheard between defendant and another police officer shortly after defendant's arrest. In response to a question about what he would do if he found the witnesses against him defendant stated, "I'd kiss them," and then began laughing.[3] He further testified that

---

**3.** The officer to whom this statement was made, Henry Harris, did not testify at this hearing. He did, however testify at trial that defendant had told him that once he was on the

in a conversation between himself and defendant regarding the brutality of the murder of Sandra Jean Smith, defendant stated, "I'd kill a brick if it crossed me." Officer Jones interpreted these statements as threats against potential witnesses.

After noting that defendant had allegedly committed two murders and kidnappings while free on bail from other murder charges the court denied his motion to be admitted to bail. It ruled that "the defendant if at liberty on bond would be a danger to the State's witnesses and to the people of this community and that the extent of the charges against the defendant are such that it is not likely that he would respond to any bond." The court stated that it was denying bail "specifically upon the theory that to admit defendant to bond would be a danger to the administration of justice in the State of Missouri." Defendant subsequently challenged the denial of bail by filing a writ of habeas corpus with this court, *Dodson v. Dyer,* No. 37,227 (Mo.App. July 15, 1975), and with the Missouri Supreme Court, *Dodson v. Dyer,* No. 59,156 (Mo. banc July 23, 1975). Both applications were denied without opinion.

 There are at least three independently sufficient grounds upon which this point may be ruled against defendant. The first of these relates to the effect of the aforementioned denials of the writs of habeas corpus. Filing an application for a writ of habeas corpus is the proper procedure for contesting the denial of bail. *State v. Thompkins, supra.* A person deprived of his liberty is not limited in the number of applications he may make except in that the additional applications may not be made to a court of inferior jurisdiction. Section 532.040 RSMo 1969; Rule 91.58 V.A.M.R.; *In re Breck,* 252 Mo. 302, 158 S.W. 843 (1913); *Weir v. Marley,* 99 Mo. 484, 12 S.W. 798 (1890). There is, however, no right of appeal from denial of a writ of habeas corpus though the decision may be reviewed by certiorari. *Jones v. State,* 471 S.W.2d 166 (Mo. banc 1971); *State v. Blair,* 357 Mo. 287, 208 S.W.2d 268 (banc 1948); *State v. Carver,* 355 S.W.2d 324 (Mo.App. 1962). Defendant, in once again raising the issue of denial of bail, in effect attempts to appeal the previous denials of his applications for writs of habeas corpus by a court of inferior jurisdiction. This procedure is not sanctioned under the statute or the rules and serves as a basis for refusing to rule on this point further.

 Second, courts have an inherent power to deny or revoke bail to protect its processes and the community. *Carbo v. United States,* 82 S.Ct. 662, 7 L.Ed.2d 769 (1962); *Fernandez v. United States,* 81 S.Ct. 642, 5 L.Ed.2d 683 (1961); *United States v. Kirk,* 534 F.2d 1262 (8th Cir. 1976); *United States v. Gilbert,* 138 U.S.App.D.C. 59, 425 F.2d 490 (1969). "While bail is favored and is granted in the ordinary course of events, an accused by his actions can forfeit his right to bail and the court is under a duty to protect its processes and to protect prospective witnesses." *United States v. Smith,* 444 F.2d 61, 62 (8th Cir. 1971), cert. den., 405 U.S. 977, 92 S.Ct. 1205, 31 L.Ed.2d 253 (1972).

In this case there was reliable, direct evidence that defendant, if he were released, would be a threat to prospective witnesses against him. Moreover, his past conduct indicated that his freedom would be potentially harmful to the safety of the community, as these murders were allegedly committed within a few hours after he had been released on bail on another murder charge. Under a protection of processes theory defendant could lawfully be denied bail.

Apt here is *People ex rel. Hemmingway v. Elrod,* 60 Ill.2d 74, 322 N.E.2d 837 (1975), where the Illinois Supreme Court, while holding there were no "capital offenses," recognized that the "constitutional right to bail must be qualified for the authority of

---

street no one would testify against him. He further testified that defendant's threat was even more explicit than Officer Jones had stated. He stated that defendant had said he "was going to hug them [the witnesses] and kiss them to death."

the courts, as an incident of their power to manage the conduct of proceedings before them, to deny or revoke bail when such action is appropriate to preserve the orderly process of criminal procedure. This action must not be based on mere suspicion but must be supported by sufficient evidence to show that it is required." 322 N.E.2d at 840.

We believe it proper and lawful to preserve the integrity of the administration of criminal justice to deny bail in exceptional and high risk cases. And we find here that there was sufficient evidence to support a denial of bail to defendant; that such denial of bail was necessary to preserve the integrity of the criminal justice system.

■ Third, there is no showing that defendant suffered any prejudice as a result of being denied bail. His alibi witnesses appeared at trial and testified to his whereabouts at ·the time of the murders. No additional punishment was imposed because of his confinement prior to trial. Section 546.615, RSMo Supp.1975 requires that credit be given against any sentence imposed for all time spent in jail awaiting trial. Defendant's first point, regarding denial of bail is therefore destitute of merit.[4]

■ Defendant next alleges that the trial court erred in overruling his motion for separation of the murder and kidnapping counts. This point is also without merit.[5] The State may not divide one crime

---

**4.** There is yet another theory for denying bail, but which we need not and do not apply in this case—the so-called "capital offense" exception.

The crime of murder in the first degree is one which the Missouri legislature had determined to be punishable by death. § 559.030 RSMo 1969, now repealed. It was universally recognized as a capital offense. At the time of defendant's trial, however, this legislatively mandated punishment was not constitutionally enforceable. *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Whether that fact eliminated the existence of the classification of crimes previously accepted as capital offenses, and therefore made all offenses bailable, is a question which has not been addressed in this State. It is true that in *Ex parte Dusenberry*, 97 Mo. 504, 11 S.W. 217 (1889), and in *Ex parte Welsh*, 236 Mo.App. 1129, 162 S.W.2d 358 (1942), a capital offense was defined as one which may be punished by death. Those decisions, however, were decided long before, *Furman v. Georgia*, supra, and do not necessarily supply the exclusive definition of capital offense in light of its holding.

Courts in several states have considered the effect of *Furman* on the meaning of "capital offense" in the interpretation of constitutional provisions similar or identical to ours dealing with bailable offenses. Two mutually exclusive theories have been developed which bring about opposite results. Those courts which hold that there are no capital offenses in the wake of *Furman* accept the penalty theory. They hold that the term capital offense relates solely to the penalty which may be imposed and not to the gravity of the crime. A capital offense is defined as one which may be punished by death. Where such punishment is not within the range of possibilities, no crimes are interpreted to fall within this category, and all crimes are bailable. See *People ex rel. Hemmingway v. Elrod*, 60 Ill.2d 74, 322 N.E.2d 837

(1975); *State v. Johnson*, 61 N.J. 351, 294 A.2d 245 (1972); *Commonwealth v. Truesdale*, 449 Pa. 325, 296 A.2d 829 (1972); *Donaldson v. Sack*, 265 So.2d 499 (Fla.1972); *Edinger v. Metzger*, 32 Ohio App.2d 263, 290 N.E.2d 577 (1972); *Ex parte Contella*, 485 S.W.2d 910 (Tex.Cr.App.1972).

Those courts which continue to recognize certain crimes as capital offenses after *Furman* do so on the classification theory. They hold that the Supreme Court's decision did not obviate the system of gradation of crimes established by the legislatures. Under the classification theory, courts look to the gravity of the crime to determine its classification. If it is one which the legislature determined to be so serious as to be punishable by death, then it remains a capital offense even though that specific punishment is unenforceable. "[T]he removal of the death penalty in no way affected the nature of the crime or the seriousness of the offense. It was the nature of the crime and seriousness of the offense which, we believe, the legislature had in mind when bail was limited . . . in capital cases." *State v. Haga*, 81 Wash.2d 704, 504 P.2d 787 (banc 1972); See also *Ex parte Bynum*, 294 Ala. 78, 312 So.2d 52 (1975); *Jones v. Sheriff, Washoe County*, 89 Nev. 175, 509 P.2d 824 (1973); *Roll v. Larson*, 30 Utah 2d 271, 516 P.2d 1392 (1973); *State v. Flood*, 263 La. 700, 269 So.2d 212 (1972); *Hudson v. McAdory*, 268 So.2d 916 (Miss.1972); *People ex rel. Dunbar v. District Court*, 179 Colo. 304, 500 P.2d 358 (banc 1972); *In re Kennedy*, 512 P.2d 201 (Okl.Cr.App.1973).

The precedent is almost equally divided between the two positions.

**5.** In his brief, defendant phrases this point in the following manner: "The trial court committed error in overruling appellant's motion for a separation of counts." As such, this point

into its component parts and prosecute the accused under the individual parts in order to obtain multiple convictions. *State v. Parsons,* 513 S.W.2d 430 (Mo.1974). Under Rule 24.04 V.A.M.R., however, the State may join in a single indictment or information "[a]ll offenses which are based on the same act or on two or more acts which are part of the same transaction or on two or more acts or transactions which constitute parts of a common scheme or plan . . ." As the Supreme Court noted in *State v. Baker,* 524 S.W.2d 122, 126 (Mo. banc 1975), which upheld the constitutionality of Rule 24.04, when joinder of offenses in a single indictment is authorized under the Rule "it is clear that trial of the separate offenses in a single trial is permissible." In this case the State alleged and proved that the acts of kidnapping and confining the victims were integral parts of a common scheme leading to their murder. The joinder of these two separate offenses in a single trial, was proper. See *State v. Neal,* 514 S.W.2d 544 (Mo. banc 1974); *State v. Brooks,* 513 S.W.2d 168 (Mo.App.1973).

Defendant's next point relates to the introduction of photographs of the bodies of the two murder victims into evidence. He contends that their admission was error, because they were so inflammatory and prejudicial as to deny him a fair trial.[6] The photographs in question were taken at the vacant lot where the bodies were discovered and at the coroner's examination as they were removed from the blankets in which they were wrapped. Eleven photographs were admitted into evidence over objection. According to the record only three of the photographs were passed to the jury. These depicted the position of the bodies while still wrapped in the blankets on the vacant lot. The court specifically denied the State's request to pass to the jury exhibits 9 and 11 which revealed the facial burns on Smith's face in gruesome detail.

Though he asks us to review their content and determine their possible prejudicial effect, defendant has failed to include the photographs with the transcript on appeal. Thus, we have no basis on which to judge the propriety of their admission. The burden is on defendant to file a complete transcript for appellate review including all exhibits whose admission is alleged to be error. Rule 28.18 V.A.M.R.; Rule 81.12 V.A.M.R.; Rule 81.14 V.A.M.R.; Rule 81.15 V.A.M.R.; *Jackson v. State,* 514 S.W.2d 532 (Mo.1974); *Garrett v. State,* 486 S.W.2d 272 (Mo.1972); *State v. Clark,* 522 S.W.2d 332 (Mo.App.1975); *State v. Davis,* 515 S.W.2d 181 (Mo.App.1974). As defendant has not met this burden, his allegation may not be considered. We will not presume error where none is shown on the record before us.

Further, from our study of the verbal description of the photographs in the transcript we believe that defendant could not have prevailed on this point even if he had delivered them for our inspection. The admissibility of demonstrative evidence such as photographs of dead bodies lies within the sound discretion of the trial court. *State v. Robinson,* 328 S.W.2d 667 (Mo.1959); *State v. Frazier,* 550 S.W.2d 590 (Mo.App.1977); *State v. McClain,* 536 S.W.2d 45 (Mo.App.1976). Such evidence is properly admissible when it sheds light on any material matter in issue. Thus, when it tends to connect the accused with the crime, prove the identity of the deceased, show the position of the body, show the location and nature of the wound, or tends to corroborate the testimony of a witness or refute a defense it is admissible unless the prejudicial effect is so great as to outweigh any possible probative value. *State v. Jones,* 515 S.W.2d 504 (Mo.1974); *State v. Jackson,* 499 S.W.2d 467 (Mo.1973); *State v. Floyd,* 360 S.W.2d 630 (Mo.1962); *State v.*

---

could be dismissed without discussion, because it violates Rule 84.04(d), in that it does not state wherein and why the trial court's ruling is erroneous. *State v. Redd,* 550 S.W.2d 604 (Mo. App.1977).

**6.** This point was not raised in defendant's motion for a new trial and was not properly preserved for review. Rule 27.20(a) V.A.M.R.; *State v. Bowens,* 476 S.W.2d 495 (Mo.1972); *State v. Rowden,* 452 S.W.2d 210 (Mo.1970).

*Frazier, supra.* In this case the photographs served a number of the above mentioned purposes and were relevant to show that defendant acted with the requisite premeditation and malice to constitute first degree murder. The trial court elaborated on his reasons for admitting certain of the photographs—that they were relevant for the jury's consideration in determining the degree of homicide. See *State v. Pinkus,* 550 S.W.2d 829 (Mo.App.1977). It is inherent that in such brutal murders as here a gruesome scene may be depicted. There was not sufficient ground to deny the photographs' admissibility, *State v. Moore,* 303 S.W.2d 60 (Mo.banc 1957), especially where, as here, the trial court refused to allow the most shocking photographs to be viewed by the jury.

Defendant next argues that admission into evidence of narcotics and narcotics paraphernalia seized from 4136 Westminster was improper because it constituted evidence of crimes other than those for which he was tried. He relies on the well recognized general principle that "evidence of commission of separate and distinct offenses is not admissible unless it has a legitimate tendency to directly establish the defendant's guilt of the crime for which he is being tried." *State v. Williams,* 539 S.W.2d 530, 533 (Mo.App.1976). See also *State v. Jackson,* 446 S.W.2d 627 (Mo.1969); *State v. Reese,* 364 Mo. 1221, 274 S.W.2d 304 (banc 1954); *State v. Cox,* 508 S.W.2d 716 (Mo.App.1974). Indiscriminate admission of evidence of unrelated crimes violates the accused's right to be tried for the offense charged. Equally well recognized is the exception to the general principle; i. e., that evidence of unrelated crimes may be admitted where relevant to show the motive for the accused's actions.[7] *State v. Richardson,* 515 S.W.2d 571 (Mo.1974); *State v. Jackson, supra.* Wide latitude is given the prosecution to develop evidence of motive. *Billings v. State,* 503 S.W.2d 57 (Mo.App.1973). The test to determine if the motive exception applies "is its logical

relevancy to the particular excepted purpose or purposes for which it is sought to be introduced. If it is logically pertinent in that it reasonably tends to prove a material fact in issue, it is not to be rejected merely because it incidentally proves the defendant guilty of another crime." *State v. Reese, supra,* 274 S.W.2d at 307 (quoting from *State v. Lyle,* 125 S.C. 406, 118 S.E. 803, 807).

The prosecution's theory was that these killings were directly attributable to defendant's drug trafficking operations at 4136 Westminster. The State attempted to show that defendant's motive for killing Smith and Clay was his anger over their alleged theft of proceeds from his drug sales. This theory is borne out by Kenneth Clay's request for Karen Cravens to tell defendant and Rabun that he did not take any money, by defendant's statement after Clay's murder that he would kill anyone who took his money, and by the discovery of money secreted in Sandra Smith's body. Thus, drug use and sales were inextricably linked to the motive for the kidnappings and murders. The logical relevancy test was satisfied, and the narcotics evidence was admissible. Under these circumstances the evidence of separate crimes was so interwoven with the evidence of the crime charged that one crime could not be coherently shown without proving the other. See *State v. Larkins,* 518 S.W.2d 131 (Mo.App.1974).

Defendant further alleges that the evidence of narcotics sales as well as all other evidence seized in the search of 4136 Westminster was inadmissible and should have been suppressed prior to trial, because it was obtained under a search warrant defective on its face. His allegation rests primarily on a claim that the affidavits in support of the warrant were insufficient to establish probable cause. But defendant has neglected to make the affidavits or the warrant a part of the record for review as required by Rule 81.12 V.A.M.R. Thus, we have no basis to rule on defendant's conten-

---

7. In addition, such evidence is relevant to prove intent, absence of mistake or accident, common scheme or plan and the identity of the accused. *State v. Reese, supra.*

tion that the documents are insufficient on their face. *Jackson v. State,* 514 S.W.2d 532 (Mo.1974).

A review of the motion to suppress proceedings convinces us that even a complete record would be unavailing to defendant, because he lacks the requisite standing to contest the legality of the search. An individual may not assert vicariously the Fourth Amendment's protections against unreasonable searches and seizures, as its purpose is to protect the individual's reasonable expectations of privacy. *In re J.R.M.,* 487 S.W.2d 502 (Mo. banc 1972); *State v. Drake,* 512 S.W.2d 166 (Mo.App. 1974). A person must be a victim of the illegal search to assert those protections. He must be the one against whom the search is directed as opposed to one who claims prejudice by the use of the fruits of a search directed at another. *United States v. Kelly,* 529 F.2d 1365 (8th Cir. 1976); *State v. Hill,* 539 S.W.2d 521 (Mo.App.1976). Thus, the issue of standing turns on whether the movant can show that under his peculiar circumstances the governmental intrusion violated his reasonable expectation of privacy. *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *In re J.R.M., supra.* No such showing can be made here, and no standing exists "where, as here, the defendants: (a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory interest in the premises; and (c) were not charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure." *Brown v. United States,* 411 U.S. 223, 229, 93 S.Ct. 1565, 1569, 36 L.Ed.2d 208, 214 (1973). See also *United States v. Tortorello,* 533 F.2d 809 (2d Cir. 1976); *State v. Ross,* 507 S.W.2d 348 (Mo.1974); *State v. Bates,* 540 S.W.2d 161 (Mo.App.1976).

Defendant has satisfied none of the *Brown* criteria. He did not arrive at 4136 Westminster until after the search was completed. The owner of the premises searched stated that someone other than defendant was the lessee. Defendant maintained that his home was at 768 Hamilton and at no time claimed a possessory interest in the Westminster address. Finally, possession of the evidence seized, though relevant to show motive, was not an essential element of the crimes charged; therefore, defendant was not entitled to "automatic standing." See *Jones v. United States, supra.* Defendant's motion to suppress the evidence was properly denied.

Defendant raises three separate points relating to the sufficiency of the evidence to sustain his conviction. First, he argues that the testimony of Karen Cravens, the State's chief witness, should have been stricken because she was under the influence of narcotics when the events to which she testified occurred. Second, he argues that Cravens was an accomplice to the crimes and that as such her testimony was insufficiently corroborated to support a conviction. Finally, he argues that even if Cravens' testimony were admissible and corroborated the State failed to make a submissible case.

Defendant's first allegation was not raised in the motion for a new trial and therefore was not properly preserved for appellate review, Rule 27.20(a) V.A.M.R.; *State v. Bowens,* 476 S.W.2d 495 (Mo.1972); *State v. Hammonds,* 459 S.W.2d 365 (Mo. 1970). We, therefore, will not consider it unless it constitutes plain error under Rule 27.20(c) V.A.M.R. We find that it does not. Cravens testified to her drug addiction and narcotics use at the time of the commission of the crimes. She also testified she was completely lucid during the entire period of time about which she testified. The jury was aware of these facts and was free to consider them in evaluating her credibility and the weight to be accorded her testimony. Such evaluation is solely within the province of the jury and is not a matter for review on appeal. *State v. Wright,* 476 S.W.2d 581 (Mo.1972); *State v. Starkey,* 536 S.W.2d 858 (Mo.App.1976); *State v. Berry,* 526 S.W.2d 92 (Mo.App.1975); *State v. Morris,* 518 S.W.2d 79 (Mo.App.1974).

Defendant's second challenge to the sufficiency of the evidence is likewise without merit. Even if we assume arguendo that Cravens was an accomplice, Missouri courts have long adhered to the common law rule that a conviction may stand on an accomplice's uncorroborated testimony. *State v. Lang,* 515 S.W.2d 507 (Mo.1974); *State v. Tressler,* 503 S.W.2d 13 (Mo.1973), cert. den. 416 U.S. 973, 94 S.Ct. 2000, 40 L.Ed.2d 563 (1974); *State v. Strong,* 484 S.W.2d 657 (Mo.1972). Such testimony is insufficient to support a conviction only where it is so lacking in probative force as to be insubstantial evidence. *State v. Powell,* 433 S.W.2d 33 (Mo.1968); *State v. Harris,* 295 S.W.2d 94 (Mo.1956); *State v. Morris, supra.* It is insubstantial only where it is inherently incredible or self-destructive, totally impeached by contradictory evidence or such that reasonable minds could not believe it. *State v. Tressler, supra; State v. Harris, supra; State v. Morris, supra.*

Karen Cravens' testimony suffered from none of these infirmities. On the contrary, her testimony provided a plausible account of the events leading up to and following the murders of Sandra Smith and Kenneth Clay. Moreover, her testimony was well corroborated by the physical and other circumstantial evidence at trial. Smith's face was shown to have been severely burned by a caustic agent such as Drano, taken by Ms. Cravens to defendant. Cravens' description of the manner in which the victims were killed was corroborated by the expert testimony of the two examining pathologists. Her description of the manner in which the bodies were bound for disposal was corroborated by East St. Louis police, even to the color of the blankets in which they were wrapped. So corroborated, Cravens' testimony was not insubstantial and could serve as the basis for defendant's conviction if believed by the jury.

Finally, defendant argues that even with Cravens' testimony the circumstantial evidence of his guilt was insufficient to submit the case to the jury. His argument is essentially that the kidnappings occurred prior to his arrival at 4136 Westminster and that there were no eyewitnesses to the murders while other persons were present at the scene who could have committed them.

In order to test the sufficiency of the evidence in a criminal prosecution we must accept the facts in evidence, along with all favorable inferences which may reasonably be drawn therefrom, in the light most favorable to the State and the jury verdict. All evidence and inferences to the contrary must be disregarded. *State v. Franco,* 544 S.W.2d 533 (Mo. banc 1976); *State v. Sloan,* 548 S.W.2d 633 (Mo.App. 1977). It is not the function of the appellate court to substitute its evaluation of the facts for that of the jury to determine if the defendant's guilt was proved beyond a reasonable doubt. We decide only if there was substantial evidence from which the jury could reasonably reach such a conclusion. *State v. Strong, supra; State v. Mason,* 506 S.W.2d 458 (Mo.App.1974). We find that there was substantial evidence of defendant's guilt.

It is of no consequence here that there was no direct evidence of defendant's precise role in the kidnapping-murders. It is not necessary for the State to prove that defendant personally committed acts constituting all of the essential elements of the crime charged. One who aids and abets in the commission of a criminal offense is guilty as a principal without proving a conspiracy. *State v. Goodman,* 482 S.W.2d 490 (Mo.1972); *State v. Reed,* 453 S.W.2d 946 (Mo.1970). All that is necessary to support a conviction is a showing of any form of affirmative participation in the crime by appellant. *State v. Reed, supra; State v. Reynolds,* 521 S.W.2d 486 (Mo.App.1975); *State v. Mills,* 495 S.W.2d 715 (Mo.App. 1973).

Defendant was indicted jointly with Billy Rabun and is criminally liable for his acts so long as the necessary affirmative participation is shown. It is uncontroverted that Rabun initially seized Smith and Clay. The offense of kidnapping, however, is also committed by confinement of the persons seized, and, thus is a continuing crime. Section 559.240 RSMo 1969. There is no doubt

that defendant actively participated in the victims' continued confinement against their will once he arrived at 4136 Westminster. There is evidence that the victims were bound to their chairs in defendant's presence for at least one hour as a prelude to their murder. This fact constitutes sufficient evidence of defendant's affirmative participation with Rabun in the kidnappings and is sufficient to support his convictions on those charges.

The same is true regarding the murder convictions. Cravens testified that just prior to the murders she went to the second floor offering to get dinner for defendant and Rabun. The only parties present in addition to Smith and Clay, who were bound but still alive, were defendant and Rabun. When Cravens returned with the food the same parties were present, but Smith was lying face down and motionless in a front room. Defendant was standing in the room with Rabun and smiling when he boasted: "I strangled that bitch to death."

At this time Clay was still alive, tied to his chair. A short time after Cravens had gone downstairs she heard gun shots from upstairs. When she returned upstairs Clay had been shot. Defendant and Rabun were the only persons on the second floor when she entered the room. On this occasion Cravens could see that Smith's face had been badly burned. After assisting in removing the bodies to a front room, she heard defendant state that he would kill anyone caught taking his money. This statement lends support to the State's theory that defendant personally killed Smith and Clay because he suspected them of stealing money from his drug operations. All of Cravens' testimony regarding these events was corroborated by the physicians who performed the autopsies on the victims. Smith's death was attributed to asphyxiation by strangulation, and the presence of facial burns was noted. Likewise the cause of Clay's death was confirmed to be gunshot wounds to the head. In view of Cravens' testimony with its corroboration and in light of defendant's direct admissions of responsibility, the evidence was not only sufficient to sustain the conviction but was overwhelming as to his guilt.

Defendant contends the trial court erred in failing to give two instructions he offered because they were "proper in these proceedings." He then sets out the instructions and his argument, which consists of one sentence for each instruction, stating that the trial court erred in failing to give the instructions, because they are "essentially the same as" MAI–CR 3.52 and 3.58. Defendant cites no authority in support of his contention. Unsupported and essentially unargued points such as these violate Rule 84.04(d). We will not review points "briefed" without citation of authority and asserted without at least some semblance of argument. *State v. Thomas,* 529 S.W.2d 379 (Mo.1975); *State v. Warters,* 457 S.W.2d 808 (Mo.1970). *State v. Paige,* 550 S.W.2d 582 (Mo.App.1977). Moreover, defendant's assertion that the refused instructions are "essentially the same" as MAI–CR is sufficient to dispose of these points. MAI–CR instructions are required to be given where applicable and the trial court commits error when it fails to do so. Rule 20.02(a),(c),(e) V.A.M.R.

At the conclusion of the evidence the court made the following statement to the jury:

"Ladies and gentlemen, it is my understanding that the evidence in this case is concluded. It will now be the duty of the Court to prepare for you the written instructions. This will necessarily take some time. Therefore, I am going to ask the sheriff to transport you back to the hotel where you can check out and return here and hopefully by that time we will have finished the instructions, counsel can present their arguments and the case can be presented to you for your deliberation."

There was an immediate objection and motion for a mistrial by defendant's counsel on the grounds that the court's statement indicated to the jury that they should hurry their deliberations to end the case. The court denied the motion for a mistrial and responded out of the hearing of the jury:

"On the contrary, Mr. Bell. What I intend to say to the jury if I get an opportunity to finish my remarks is that after the case is presented to them they can deliberate as long as they please."

The court then continued its remarks to the jury:

"We can proceed in that manner and you will not have to be concerned about leaving the hotel and you can have all the opportunity to deliberate on this case that you can ask for and require after the matter is submitted to you later on without any pressure or concern about being up in the hotel or anything of that kind."

Immediately before the instructions were read to the jury the court once again informed them:

"Ladies and gentlemen, I don't want anybody to feel any pressure upon you as far as transportation and I don't want you to feel under any pressure in your deliberations in this case."

▪ Defendant renews his objection on appeal alleging that the trial court's remarks intimated that the verdict was a foregone conclusion. It is a fundamental tenet of our system of jurisprudence that in order to protect the accused's right to a fair trial the judge must maintain a high standard of fairness and impartiality throughout the course of the trial. He should make no remark which could reasonably be construed by the jury to the accused's prejudice. *State v. Hudson,* 358 Mo. 424, 215 S.W.2d 441 (1948); *State v. Hurd,* 550 S.W.2d 804 (Mo.App.1977); *State v. Embry,* 530 S.W.2d 401 (Mo.App.1975).

"[T]he measure for determining if the trial court has acted improperly is whether the trial court's conduct is such as to prejudice the minds of the jury against defendant thereby depriving defendant of a fair and impartial trial." *State v. Hill,* 518 S.W.2d 682, 685 (Mo.App.1975).

On the basis of the record we cannot say that the remarks complained of deprived defendant of a fair trial or that they operated to his prejudice in any manner. Even if we were to construe the court's remarks as "intimating that the verdict was a foregone conclusion" and as intended to expedite jury deliberations, there is nothing within the context of the court's remarks which indicates any bias against defendant. The statement complained of is completely neutral on its face. Comments by the trial court directed towards the expeditious disposition of the litigation and in terms applicable to both parties without any hint of partiality could not have impaired defendant's right to a fair trial. *State v. Brown,* 524 S.W.2d 188 (Mo.App.1975).

▪ Furthermore, even where the trial court's remarks are improper the prejudicial effect created may be removed where the court promptly cures the prejudice by instruction, admonition, or further explanation to the jury. *State v. Castino,* 264 S.W.2d 372 (Mo.1954); *State v. Hudson, supra.* The trial court here thoroughly emphasized, after its initial remarks were interrupted by counsel's objection, that the jurors were to take as much time to deliberate as they needed. The court's curative statements (if, indeed, any were necessary) were prompt and proper; any possible prejudice defendant suffered from the earlier remarks was removed. We are convinced that the fact that the jury's deliberation time was short was caused not by the court's remarks.

Defendant's final point related to the interviewing of Ms. Cravens by his attorney. Prior to trial, at defendant's counsel's request, the State was directed to make its witnesses, including Ms. Cravens, available to be interviewed. The interviews were conducted before a court appointed commissioner, and, at the insistence of the circuit attorney, Ms. Cravens was interviewed by defendant's counsel with an assistant circuit attorney present. Defendant's counsel objected to the procedure regarding Ms. Cravens, but followed through with his interview of her and acknowledged that she had answered "everything" asked of her by him. Immediately prior to trial, defendant's attorney requested an opportunity to again interview Ms. Cravens outside the circuit attorney's presence. The private interview was denied, but defendant's counsel was

granted leave to interview her in open court before trial—an offer accepted by counsel. However, defendant's counsel ultimately declined further interview of Ms. Cravens, stating ". . . I think I have asked her too many questions already."

Defendant contends on appeal that the trial court's refusal to accord him a private interview with Ms. Cravens denied him due process and the right to a fair trial. The decision to be interviewed is, in the first instance, that of the prospective witness, and Ms. Cravens was under no obligation to talk to any counsel. *State v. Gilliam*, 351 S.W.2d 723 (Mo.1961); *United States v. Long*, 449 F.2d 288 (8th Cir. 1971), cert. den., *Tocco v. United States*, 405 U.S. 974, 92 S.Ct. 1191, 31 L.Ed.2d 247 (1972). But, of course, an accused has a right to interview consenting prospective witnesses prior to trial. *State v. Berstein*, 372 S.W.2d 57 (Mo.1963); Cf. *Kern v. State*, 507 S.W.2d 8 (Mo. banc 1974). It is palpable that defendant's counsel was afforded the right to interview Ms. Cravens.

The issue on this point is whether the defendant has a right to conduct the interview outside of the hearing of the prosecutor. Defendant in arguing that he has such a right relies primarily on the following statement from *State v. Berstein, supra* at 61: "In order to avoid coercion or intimidation of the witness for the prosecution, and so as not to hamper the defendant's counsel, the interview with the witness should be conducted out of the presence of the prosecutor and with as much privacy as is consistent with reasonable security measures . . ." However, as the State points out, the statement, in addition to being couched in directory rather than mandatory terms, is dictum. In *Berstein*, defendant's counsel requested and was refused any opportunity to interview the prospective witness. Thus, the issue of the propriety of the prosecutor's presence at the interrogation was not before the court for decision, and its statement regarding that issue is not controlling.

Nevertheless, we agree, as in *Berstein*, that a private interview is the preferred procedure to follow and that under certain circumstances a denial of this opportunity could constitute reversible error. See *State v. Gress*, 210 Kan. 850, 504 P.2d 256 (1972); *Bobo v. Commonwealth*, 187 Va. 774, 48 S.E.2d 213 (1948); *Frazier v. State*, 142 Miss. 456, 107 So. 674 (1926); *Gallman v. State*, 29 Ala.App. 264, 195 So. 768 (1940). It is only where the trial court's error results in prejudice to the defendant's rights, that it may serve as the basis for reversal. *State v. Degraffenreid*, 477 S.W.2d 57 (Mo. banc 1972); *State v. Gibson*, 502 S.W.2d 310 (Mo.1973); *State v. Martin*, 530 S.W.2d 447 (Mo.App.1975); *State v. Belleville*, 530 S.W.2d 392 (Mo.App.1975). Where the evidence of guilt is strong, otherwise improper actions by the trial court may be rendered harmless when they do not contribute substantially to defendant's conviction. In this case defendant's attorney acknowledged that Ms. Cravens had answered all of his questions, and he declined a further interview offered by the court. Furthermore, at the time Cravens testified there was no claim of surprise or any other objection based on the inability to interview her in private. We cannot discern any way in which defendant was prejudiced. The conviction will not be disturbed on this point.

Finding no reversible error, we affirm defendant's convictions.

WEIER, J., concurs.

KELLY, P. J., concurs in result.