**Doyle J. WILLIAMS, Appellant,**

v.

**Bill ARMONTROUT, Appellee.**

No. 88–1342.

United States Court of Appeals, Eighth Circuit.

Submitted April 10, 1990.

Decided Aug. 15, 1990.

Leave to File Amicus Briefs in Support of Petition for Rehearing En Banc Denied, Petitions for Rehearing En Banc Denied Oct. 12, 1990.

Charles W. German, Kansas City, Mo., for appellant.

John M. Morris, Jefferson City, Mo., for appellee.

Before LAY, Chief Judge, BRIGHT, Senior Circuit Judge, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN, MAGILL, and BEAM, Circuit Judges, En Banc.

FAGG, Circuit Judge.

Doyle J. Williams, a Missouri prisoner convicted of capital murder, appeals the district court's denial of his petition for a writ of habeas corpus. *See* 28 U.S.C. § 2254 (1982). We affirm.

## I. BACKGROUND

Williams's capital murder conviction arose out of a cold-blooded scheme to eliminate witnesses who might implicate him in the 1980 burglary of a doctor's office in Auxvasse, Missouri. After the burglary, Williams attempted to pass a forged prescription using a form stolen in the burglary. Williams first murdered the doctor in the belief that by preventing the doctor from testifying that he had not signed the prescription form, the state's charge against Williams for attempting to obtain a controlled substance by fraud would fail. Williams was eventually convicted of murdering the doctor. *See generally Williams v. Armontrout*, 877 F.2d 1376, 1378 (8th Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 1140, 107 L.Ed.2d 1044 (1990). With the help of one of his girl friends and his accomplice in the burglary, Williams then set out to kill the accomplice's roommate, who could also tie Williams to the crime. The girl friend was Betty Coleman, and the accomplice was John Morgan. The target of the murder scheme was Kerry Brummett.

To carry out the murder, Williams asked Coleman to arrange a date with Brummett late on October 9, 1980. Coleman met Brummett at a restaurant and drove Brummett to an isolated area near the Missouri River where Williams and Morgan were waiting. When Coleman and Brummett arrived, the men dragged Brummett from the car, brutally beat him, and handcuffed his hands behind his back. The men then put Brummett in the trunk of the car Coleman had arrived in and drove to a location where they could sink Brummett's body in the river after they killed him. Finding their chosen location occupied by campers, the men drove on in search of another secluded location to complete their murderous scheme.

When they reached a deserted point at the river's edge, Williams and Morgan removed Brummett from the trunk. While Morgan obtained a rope and weight to dispose of Brummett's body, Williams brutally beat the handcuffed Brummett. No doubt sensing the men's intentions, Brummett exercised his final option and fled toward the river with Williams in hot pursuit. Brummett ran into the water and immediately sank. After Brummett surfaced for the second time, Williams ordered Morgan to shoot him. Despite Williams's order, Morgan later explained that he aimed and fired over Brummett's head. Williams, who could have rescued Brummett if he was not bent on murder, entered the water only in an attempt to retrieve incriminating handcuffs from the body of a drowned man. When authorities discovered Brummett's beaten and handcuffed body seven days later, they determined the cause of death was drowning. Other opinions further detail these facts. *See Williams v. Armontrout*, 679 F.Supp. 916, 922 (W.D.Mo. 1988); *State v. Williams*, 652 S.W.2d 102, 106–07 (Mo.1983) (en banc).

Coleman was convicted at a separate trial of capital murder and sentenced to life imprisonment. Morgan received immunity from all charges in exchange for his testimony at Coleman's and Williams's trials. In 1981, a Missouri jury convicted Williams of capital murder. *See* Mo.Rev.Stat. § 565.001 (1978) (repealed 1984). After a sentencing hearing, the same jury recommended the death penalty based on the aggravating circumstance of murder for the purpose of preventing a witness from testifying in a judicial proceeding. *See* Mo. Rev.Stat. § 565.012.2(12) (Supp.1981) (repealed 1984). The state trial court sentenced Williams to death. The Missouri Supreme Court affirmed the conviction and sentence on direct appeal. *See* 652 S.W.2d at 117. Williams then sought a writ of habeas corpus in federal district court. We affirmed the district court's dismissal of this writ for failure to exhaust state court remedies. *See Williams v. Wyrick,* 763 F.2d 363, 365 (8th Cir.1985) (per curiam).

Williams unsuccessfully sought state postconviction relief, and the Missouri Court of Appeals affirmed. *Williams v. State,* 712 S.W.2d 404, 411 (Mo.Ct.App. 1986). Williams then brought this action in the district court seeking a second writ of habeas corpus under section 2254. In a comprehensive opinion, the district court denied the petition. *See* 679 F.Supp. at 949. Williams now appeals that denial to this court, claiming a number of errors we consider in turn.

## II. LESSER INCLUDED OFFENSE INSTRUCTION

Williams asserts the state trial court denied him due process by refusing to instruct the jury on first-degree (felony) murder. *See* Mo.Rev.Stat. § 565.003 (1978) (repealed 1984). Williams argues he was entitled to the felony murder instruction because Brummett's death occurred during a kidnapping. *See id.* § 565.110.1(4)–(5) (1978). Williams also argues he was denied his right to equal protection because the Missouri Supreme Court applied in his case a different rule on felony murder as a lesser included offense than 'the Court applied in other cases.

In a capital case, due process requires a trial court to instruct the jury on all lesser included offenses supported by the evidence. *See Hopper v. Evans,* 456 U.S. 605, 611, 102 S.Ct. 2049, 2052–53, 72 L.Ed.2d 367 (1982); *Beck v. Alabama,* 447 U.S. 625, 637–38, 100 S.Ct. 2382, 2389–90, 65 L.Ed.2d 392 (1980). At the time of Williams's trial, felony murder was a lesser included offense of capital murder under Missouri law. *See* Mo.Rev.Stat. § 565.006.1 (1978); *State v. Daugherty,* 631 S.W.2d 637, 645 (Mo.1982); *State v. Fuhr,* 626 S.W.2d 379, 379 (Mo.1982). The Missouri Supreme Court later held that felony murder is not a lesser included offense of capital murder in that state. *See State v. Baker,* 636 S.W.2d 902, 904–05 (Mo.1982) (en banc), *cert. denied,* 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983). The following year, the Missouri court ruled the *Baker* holding would be applied only prospectively. *See State v. Goddard,* 649 S.W.2d 882, 889 (Mo.) (en banc), *cert. denied,* 464 U.S. 997, 104 S.Ct. 495, 78 L.Ed.2d 689 (1983). *Goddard* is the basis for Williams's equal protection argument and we recognize that some members of the Missouri Supreme Court have been critical of *Goddard*'s treatment of *Baker.* *See, e.g., State v. Holland,* 653 S.W.2d 670, 680 (Mo.1983) (en banc) (Welliver, J., dissenting) ("The majority ... has treated similarly situated defendants differently in a transparent effort to avoid granting them new trials."); *id.* at 679–81; *Williams,* 652 S.W.2d at 117–18 (Welliver, J., dissenting); *Goddard,* 649 S.W.2d at 890–92 (Welliver, J., dissenting).

Williams's federal due process and equal protection arguments depend on Williams's contention the evidence at his trial supported giving the felony murder instruction as a lesser included offense of capital murder. *See Hopper,* 456 U.S. at 611, 102 S.Ct. at 2052–53; *Beck,* 447 U.S. at 635–37, 100 S.Ct. at 2388–90. We conclude the evidence does not provide the necessary support.

The federal district court in analyzing Williams's lesser included offense argument first determined that lack of premeditation was an essential element of felony

murder in Missouri. *See* 679 F.Supp. at 924–25. After reviewing the evidence in the case, the court concluded that "overwhelming evidence of premeditation was presented." *Id.* at 924. Thus, the district court held the record did not support giving a felony murder instruction because "there was no evidence from which a reasonable jury could have concluded ... lack of premeditation was present." *Id.*

The state trial court, however, had taken a different approach to Williams's request for a felony murder instruction. The state court determined that under the evidence in this case no separate kidnapping occurred, and hence, no underlying felony was present to justify giving a felony murder instruction. We agree with the state court's analysis.

■■■ Missouri law does not recognize as a separate offense an abduction that otherwise meets the elements of a kidnapping when the abduction is "merely incidental to another offense." *State v. Erby,* 735 S.W.2d 148, 149 (Mo.Ct.App.1987); *see, e.g., State v. Jackson,* 703 S.W.2d 30, 32–33 (Mo.Ct.App.1985); *State v. Jackson,* 703 S.W.2d 23, 24–25 (Mo.Ct.App.1985); *State v. Stewart,* 615 S.W.2d 600, 602–04 (Mo.Ct. App.1981); *State v. Johnson,* 549 S.W.2d 627, 630–33 (Mo.Ct.App.1977); *see also State v. Coleman,* 660 S.W.2d 201, 209–10 (Mo.Ct.App.1983). In determining if the abduction is merely incidental for these purposes, the state trial court must consider whether the abduction substantially increased the risk of harm to the victim beyond the risk inherent in the principal crime. *See, e.g., Erby,* 735 S.W.2d at 149; *Jackson,* 703 S.W.2d at 31–33; *Jackson,* 703 S.W.2d at 24–25; *Stewart,* 615 S.W.2d at 604; *Johnson,* 549 S.W.2d at 631–33. Under these controlling legal principles, a victim who is marked for murder and transported to carry out the killing does not experience an "increased risk of harm or danger ... from the movement itself or from the potential of more serious criminal activity because of the remoteness ... of the area to which the victim is moved." *Jackson,* 703 S.W.2d at 25. Thus, Missouri would not recognize an abduction that is part and parcel of a premeditated murder plan as a separate kidnapping offense.

■■■ The state trial court was aware of these critical principles of Missouri law and clearly appreciated their significance in Williams's case. In refusing to give the kidnapping-based felony murder instruction requested by Williams, the trial court stated:

The [c]ourt ... does not feel ... there is evidence sufficient to submit on the felony murder theory. The ... only evidence ... is that [Williams], together with one John Morgan, set about with an intent and design to cause the death of the deceased in this case, Kerry Brummett.

The plan was ... that [Brummett] would be killed and his body thrown in the Missouri River.

The [c]ourt feels that the kidnapping that took place ... was merely one link in the chain of events that had been planned by [Williams] and John Morgan in committing the offense of murder.

. . . .

Now, the [c]ourt feels ... there is no evidence to the contrary. [Thus,] ... there is no independent collateral felony to draw upon to create the crime of felony murder. And ... the kidnapping ... would just be one of the circumstances planned by the two conspirators to cause the death of Kerry Brummett.

State Trial Tr. at 613–14. Based on the evidence in this case, we agree with the state trial court that under controlling principles of Missouri law Williams's conduct did not rise to the level of a separate kidnapping. Thus, the evidence did not establish a separate felony to support Williams's requested felony murder instruction.

From the outset Brummett was slated to be killed. This was because Williams was bent on eliminating witnesses who might implicate him in the burglary of a doctor's office. To this end, Williams had already murdered the unfortunate doctor. Brummett's abduction and movement in the trunk of the car did nothing to intensify the risk he faced from the beginning. Instead, Brummett's abduction was Williams's chosen method to accomplish his plan to mur-

der Brummett and dispose of the body secretly.

Indeed, in Coleman's prosecution for Brummett's murder, Williams's girlfriend claimed she was entitled to a felony murder instruction because Brummett's abduction was a kidnapping. *See Coleman,* 660 S.W.2d at 208. The Missouri Court of Appeals recognized at once that "there [was] no evidence that Brummett was kidnapped ... within the meaning of the [kidnapping] statute." *Id.* at 210. Instead, the court held the evidence showed "[Coleman], Morgan, and Williams planned the 'luring' of Brummett to a predetermined location for the express purpose of murdering him.... The transportation of Brummett without his consent was merely the physical means to complete the murder." *Id.* We completely agree.

Because the evidence did not support Williams's claim that Brummett's abduction was a separate felony, the state trial court's refusal to give the requested instruction on the lesser included offense of felony murder did not violate due process. *See Hopper,* 456 U.S. at 611, 102 S.Ct. at 2052–53; *Beck,* 447 U.S. at 637–38, 100 S.Ct. at 2389–90. Similarly, despite the Missouri Supreme Court's arguably inconsistent application of its felony murder precedents on this point, *supra* at 928, Williams's equal protection claim necessarily fails because the evidence presented in his case did not fall within the state law principles entitling him to the felony murder instruction in the first instance.

## III. OTHER CRIMES EVIDENCE

■ Williams contends the trial court improperly admitted evidence of Williams's involvement in burglarizing the doctor's office, killing the doctor, and attempting to obtain controlled substances using forged prescriptions. Williams argues that because this evidence "bore only a tenuous relationship to the Brummett matter," it should have been excluded. At a minimum, Williams argues the trial court should have given a limiting instruction to the jury on the evidence's permissible uses, despite his counsel's failure to request one, *see* 679 F.Supp. at 928. We disagree.

This evidence was highly relevant to show both Williams's motive for the Brummett murder (witness elimination) and a common scheme or plan (to kill the doctor first, then Brummett). *See id.* at 927; 652 S.W.2d at 110. In light of all the other evidence at trial, we agree with the district court that admission of this evidence does not show the type of prejudice resulting in a fundamentally unfair trial. *See* 679 F.Supp. at 927. *See also Mercer v. Armontrout,* 844 F.2d 582, 586–87 (8th Cir.), *cert. denied,* 488 U.S. 900, 109 S.Ct. 249, 102 L.Ed.2d 238 (1988); *Manning–El v. Wyrick,* 738 F.2d 321, 323 (8th Cir.) (per curiam), *cert. denied,* 469 U.S. 919, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984); *Britton v. Rogers,* 631 F.2d 572, 575 (8th Cir.1980), *cert. denied,* 451 U.S. 939, 101 S.Ct. 2021, 68 L.Ed.2d 327 (1981). In addition, we find no due process error in the trial court's failure to give a limiting instruction on its own motion. *See Amos v. Minnesota,* 849 F.2d 1070, 1073–74 (8th Cir.), *cert. denied,* 488 U.S. 861, 109 S.Ct. 159, 102 L.Ed.2d 130 (1988); *Williams,* 679 F.Supp. at 928.

## IV. PROSECUTOR'S CONDUCT AND COUNSELS' PERFORMANCE

■ Before discussing the issues considered in this part of our opinion, we note several principles concerning the state court proceedings in Williams's case. The factual findings made by the state courts are presumptively correct. *See Sumner v. Mata,* 449 U.S. 539, 550, 101 S.Ct. 764, 770–71, 66 L.Ed.2d 722 (1981); *Frank v. Brookhart,* 877 F.2d 671, 674–75 (8th Cir. 1989), *cert. denied,* — U.S. —, 110 S.Ct. 736, 107 L.Ed.2d 754 (1990); 28 U.S.C. § 2254(d) (1982). These findings are presumptively binding on determinations in federal habeas proceedings when they are fairly supported by evidence in the record. *See Marshall v. Lonberger,* 459 U.S. 422, 432, 435, 103 S.Ct. 843, 851, 74 L.Ed.2d 646 (1983); 28 U.S.C. § 2254(d). Williams bears the burden of establishing that these factual determinations are erroneous. *Sumner,* 449 U.S. at 550, 101 S.Ct. at 770–71; *Frank,* 877 F.2d at 675. After carefully examining the record, we believe all of the state court findings are adequately supported, and to the extent they apply to the

claims Williams raises in this appeal, we adopt them.

We also note the district court occasionally took alternate or additional positions on Williams's claims, including in some instances Williams's procedural default. Williams, however, insists we are in a position to reach the merits of all of his contentions, and we have taken this opportunity to do so. Thus, we have not considered the district court's alternate reasoning.

## A. PROSECUTORIAL MISCONDUCT

Williams makes numerous claims that the prosecution failed to disclose requested, material evidence favorable to his case. *See United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383–84, 87 L.Ed.2d 481 (1985); *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963); *Daniels v. Wood*, 819 F.2d 195, 198 (8th Cir.), *cert. denied*, 484 U.S. 861, 108 S.Ct. 177, 98 L.Ed.2d 131 (1987). In addition, Williams claims the prosecution failed to advise the defense of the extent of Morgan's immunity and allowed Morgan to testify falsely concerning that immunity. To promote continuity with the other proceedings since Williams's trial, we refer to these claims by the names of the individuals involved.

### 1. *Larry Pirner and Pamela Mealey*

■ Pirner was the night manager at the restaurant where Coleman met Brummett on the night of the murder. Mealey asserts she was a customer in the restaurant that evening. At a hearing on Williams's motion for new trial, Mealey testified she had given a report to law enforcement authorities that she saw Brummett at the restaurant on the night he was killed, but that he left with a woman who was not Coleman. After Williams's trial, Pirner also testified that police had interviewed him, and he gave them a report similar to Mealey's.

On direct appeal, the Missouri Supreme Court adopted the state trial court's determination that there was no credible evidence showing Mealey actually made the report. *See* 652 S.W.2d at 116–17; 712 S.W.2d at 408; *see also* 679 F.Supp. at 934. The state trial court also found there was

no credible evidence Pirner made any report to authorities. *See* 679 F.Supp. at 933. The district court thus held that Williams "failed to establish the first prong of the *Brady* test ... because the state cannot suppress evidence ... it does not possess." *Id.* We agree.

### 2. *Debbi Salmons*

■ Williams contends Salmons convinced his lawyers not to call Robert Day as a defense witness. Williams's lawyers had considered calling Day to testify that Day had gone to Williams's home to borrow money on the night Brummett was murdered. This testimony might have corroborated Williams's contention that he spent the night at home with another of his girl friends. According to Williams, Salmons made a statement to authorities that Day was confused about the date of the loan transaction and that the prosecution withheld this statement from Williams.

The district court correctly determined Williams had failed to show Salmons's statement would have been helpful because both she and Day were uncertain about the critical times and dates. *See id.* at 938–39. Williams nevertheless argues the defense would have called Day as a witness had it known of Salmons's statement. As we point out later, however, assuming Day testified accurately about the date he saw Williams, that testimony would not have been helpful to Williams's defense. *See infra* at 933. Under these circumstances, we do not believe Williams has shown the prosecution withheld evidence that was either favorable or material to Williams's case. *See Bagley*, 473 U.S. at 674–75, 682, 105 S.Ct. at 3383–84; *Brady*, 373 U.S. at 87–88, 83 S.Ct. at 1196–97.

### 3. *Barbara Rea*

Rea, who was Coleman's roommate, loaned her car to Coleman for the fatal rendezvous with Brummett. Williams claims the prosecution knew police had coerced Rea's testimony by threatening to take her child from her and had failed to disclose the existence of this coercion. The district court, however, adopted the state

court's finding that Williams had not shown Rea testified under threat of any kind. *See* 679 F.Supp. at 937; 712 S.W.2d at 409. In addition, the district court determined Williams had not established the prosecution knew of the threat even if it existed and that had any coercion been disclosed, it would not have altered the trial's result. *See* 679 F.Supp. at 937. We find nothing in the record to contradict these determinations, and thus, Williams's argument on this point is without merit.

### 4. *John Morgan*

█ Williams asserts the prosecution failed to disclose that the immunity Morgan received in exchange for his testimony was not as broad as the defense had been led to believe it was. Williams also contends the prosecution allowed Morgan to testify falsely that the broader immunity was in place.

The district court aptly observed that Williams was not prejudiced by Morgan's testimony about his overstated immunity because, if anything, it opened Morgan to wider attack on cross-examination by making him appear to have a greater reward for testifying against Williams. *See id.* at 933. We are convinced by the district court's reasoning that any miscommunication regarding Morgan's immunity did not prejudice Williams and would not have affected the outcome of his trial. *See United States v. Foster,* 874 F.2d 491, 494–95 (8th Cir.1988). Furthermore, the crux of Williams's argument is that the prosecution in his case did not have authority under Missouri law to grant Morgan immunity from prosecution for offenses committed in other counties. *See* 679 F.Supp. at 932. This argument has already been considered and rejected in Williams's prosecution for murdering the doctor. *See Williams,* 877 F.2d at 1383 & n. 2.

### B. INEFFECTIVE ASSISTANCE OF COUNSEL

A public defender represented Williams throughout the course of the state prosecution. In addition, Williams's family retained private counsel who entered the case approximately one month before trial. The two lawyers worked together on the case and hired two investigators to assist them. Williams asserts numerous instances of ineffective assistance by these counsel. Bearing in mind the general controlling standards for these types of claims, *see Strickland v. Washington,* 466 U.S. 668, 687–88, 691, 694, 104 S.Ct. 2052, 2064–65, 2066–67, 2068 (1984); *Laws v. Armontrout,* 863 F.2d 1377, 1381–82, 1386, 1389–94 (8th Cir.1988) (en banc), *cert. denied,* —— U.S. ——, 109 S.Ct. 1944, 104 L.Ed.2d 415 (1989), we examine each claim in turn.

### 1. *Pretrial Investigation*

Williams first argues his trial counsel should have discovered three potentially favorable witnesses who provided evidence after the trial concerning Brummett's murder. These witnesses are: (1) Larry Pirner; (2) Pamela Mealey; and (3) Jesse Maxwell.

█ Pirner, the night restaurant manager, fled the state in February 1981 to avoid arrest on criminal charges. The district court, relying on the state trial court's findings, found that after Williams's attorneys entered the case, both they and their investigators went to the restaurant seeking to discover information about the night of the murder. *See* 679 F.Supp. at 943. They were told Pirner no longer worked there and that no one knew how to contact him. *See id.* at 943; *see also* 712 S.W.2d at 407–08. In addition, the district court determined " 'defense counsel had no reason to believe from the facts in their possession that Pirner had any information [that] was helpful or favorable to the defense.' " 679 F.Supp. at 943 (quoted citation omitted). Thus, when authorities eventually apprehended Pirner and extradited him from California to Missouri later in 1981, Pirner's return was of no significance to the case.

Williams contends his lawyers should nonetheless have attempted to locate Pirner by using restaurant records to contact Pirner's parents. Williams, however, did not show Pirner's parents knew where he

was or that they would have revealed that information to Williams's attorneys in view of Pirner's fugitive status. In the case of a fugitive of unknown whereabouts with no known useful information, we agree with the district court that Williams's counsel conducted a reasonable investigation regarding Pirner.

 Mealey did not work at the restaurant, but was merely a customer. Although Williams did not tell his lawyers Mealey was at the restaurant that night, he contends they "should have found her in time to use her at trial." When Williams's lawyers and investigators went to the restaurant, however, Mealey's name was not mentioned as a customer. At his postconviction hearing, Williams testified he gave his lawyers the names and addresses of people he "associated with almost on a daily basis," including Mealey, Nina Potts, and other acquaintances. This list was to aid Williams in accounting for his activities on the night of October 9 and the early morning of October 10 and to identify people who might be called as alibi witnesses. According to Williams, he told his lawyers to contact these people.

From the lawyers' perspective, the difficulty with Williams's alibi defense was that Williams gave them five possible alibis. *See* 712 S.W.2d at 406. Eventually, Williams told his lawyers "his alibi would be that he was in bed with his girl friend Nina Potts." *Id.* Once Williams established Potts as the basis for his alibi, there was no reason for the lawyers to contact Mealey as a crucial alibi witness. *See United States v. Cockrell,* 720 F.2d 1423, 1428 (5th Cir.1983) ("failure to investigate everyone whose name happens to be mentioned by [a] defendant does not suggest ineffective assistance"). In these circumstances, we agree with the Missouri Court of Appeals that "[t]here is no basis shown to indicate ineffectiveness concerning the discovery or production of Mealey." 712 S.W.2d at 408.

 According to Williams, Maxwell would have been able to testify that he saw Morgan at a bait and tackle shop in the early morning hours on the date Brummett was murdered. At Williams's postconviction hearing, however, Maxwell testified "he could not remember if he had seen Morgan at 1:00 a.m. on October 9 or October 10." *Id.* In addition, there was no evidence of how Williams's lawyers could have been expected to discover Maxwell's identity because he did not come forward until ten months after Williams was convicted. *See* 679 F.Supp. at 944. Further, Maxwell had not mentioned the asserted encounter with Morgan during his interview with the prosecutor before Williams's trial. *See id.;* 712 S.W.2d at 408. We agree with the district court that "[u]nder these circumstances, Williams has not established that counsel's investigation was professionally unreasonable." 679 F.Supp. at 944.

### 2. *Trial Performance*

Williams's claims of ineffective assistance related to his trial fall into three categories, which we discuss in turn.

#### a. Witness Selection

 Williams claims his lawyers should have called Roger Hazlett and Robert Day as defense witnesses. According to Morgan's testimony, he and Williams went to Hazlett's house after the murder and burned their bloody clothing in the front yard. The state postconviction court found Hazlett told Williams's lawyer that he was drunk that night and did not remember anything. *See* 712 S.W.2d at 408. The district court found Williams's lawyer made a reasonable decision not to call Hazlett after determining he had no solid recollection of the events and no other useful information. *See* 679 F.Supp. at 947. We agree.

Day's recollection of the date and circumstances regarding his borrowing money from Williams was unsure. In addition, even his best version failed "to demonstrate how it would have been impossible for [Williams] to have been at home at 9:30 p.m. and still have been involved in a murder that occurred [around 1:45 a.m.] just a short distance away." 712 S.W.2d at 408; *see also* 679 F.Supp. at 947.

Decisions relating to witness selection are normally left to counsel's judgment, and "this judgment will not be second-guessed by hindsight." *See Frank*, 877 F.2d at 674. In this situation, we observe no inadequate performance by Williams's attorneys in failing to call either Hazlett or Day as witnesses.

### b. Witness Cross–Examination

■ As we discussed earlier, Williams's accomplice, Morgan, testified against Williams under a grant of immunity. Williams claims his lawyers did not fully discredit Morgan's testimony by further probing into the extent of this immunity. In addition, Williams claims his counsel should have more vigorously cross-examined Morgan about his prior inconsistent statements to police. On postconviction review, the Missouri Court of Appeals determined these matters were fully put before the jury to determine Morgan's credibility. *See* 712 S.W.2d at 409; *see also* 679 F.Supp. at 945.

Similarly, Williams asserts his counsel did not properly cross-examine Kay Lepley about her immunity to testify. Williams believes this cross-examination would have undermined Lepley's testimony that she had seen Williams with a pair of handcuffs five days before the murder. We disagree. Lepley testified she had no immunity. *See* 679 F.Supp. at 945; 652 S.W.2d at 111; 712 S.W.2d at 409. In any event, her testimony concerning the handcuffs was cumulative. *See* 679 F.Supp. at 935; 712 S.W.2d at 409. We find no shortcomings of a constitutional dimension in the cross-examination of Morgan or Lepley.

### c. Jury Instructions

■ Williams also contends his lawyers should have requested a limiting instruction on the other crimes evidence, *see supra* at 930, and a cautionary instruction on Morgan's credibility as an accomplice and a drug addict. We agree that the decision not to request the first instruction was a reasonable, strategic choice designed to avoid highlighting Williams's other undesirable activities. *See* 679 F.Supp. at 945; 712 S.W.2d at 407. Concerning the credibility instruction, both the district court and the state trial court held the jury received the only instruction permitted under Missouri law. *See* 679 F.Supp. at 946; 712 S.W.2d at 407. Furthermore, any errors in state law instructions must have fundamentally infected the fairness of Williams's trial in order to justify federal habeas corpus relief. *See Berrisford v. Wood*, 826 F.2d 747, 752 (8th Cir.1987), *cert. denied*, 484 U.S. 1016, 108 S.Ct. 722, 98 L.Ed.2d 671 (1988). Thus, we find no error regarding counsel's decision not to request these instructions.

### 3. *Cumulative Effect of Counsel's Errors*

We have found no ineffective assistance by Williams's lawyers in any of the pretrial investigation or trial performance matters raised in this appeal. We agree with the Missouri Court of Appeals that "Williams was represented by two experienced lawyers who spent many hours in preparation for trial and who had the assistance of two investigators.... [These lawyers] gave Williams effective representation and did all any attorney could have done to insure that all of Williams'[s] constitutional rights ... were protected." 712 S.W.2d at 411. Thus, we necessarily reject Williams's additional argument that the cumulative effect of these asserted errors amounted to ineffective assistance. *See* 679 F.Supp. at 949; 712 S.W.2d at 410–11.

### V. SUFFICIENCY OF EVIDENCE AND CAPITAL MURDER INSTRUCTION

Finally, Williams contends there was insufficient evidence to support his conviction. Williams's sufficiency argument is closely tied to his attack on the jury instruction containing the elements of capital murder. The jury was instructed that in order to convict Williams it was required to find, among other things, that he had "caused the death of Kerry Brummett by beating him and drowning him." Williams contends this instruction was flawed because: (1) the medical evidence showed Brummett drowned, and there was no evidence to support a finding that he died from the beating; and (2) the applicable capital murder statute required the jury to find Williams caused Brummett's *killing* and, thus, the trial court lowered the standard of proof required for conviction when it instructed the jury it had to find Williams caused Brummett's *death.*

■ The Missouri Supreme Court has rejected Williams's first argument in an analogous context involving an instruction that referred to death by striking and suffocating. *See Daugherty*, 631 S.W.2d at 639–41; *see also Williams*, 652 S.W.2d at 114–15. In *Daugherty*, the court held that even when "the medical expert's opinion

included suffocation and hemorrhage as causes of death[,] [that] does not invalidate other aspects of the attack as a contributing factor." 631 S.W.2d at 640. In view of this holding and our agreement with the state court that "[t]here was ample evidence at trial showing ... [Brummett] was beaten, handcuffed[,] and drowned," 652 S.W.2d at 114, Williams's first contention is without merit, see 679 F.Supp. at 928–29.

■ Williams's further attempt to draw significance from a difference between "causing Brummett's killing" and "causing his death" amounts to little more than a play on words. Standard dictionaries equate the two. See Webster's Third New International Dictionary 1242 (1981). We agree with the district court that this difference, if any, did not fundamentally misdirect the jury in violation of due process. See 679 F.Supp. at 928; see also Berrisford, 826 F.2d at 752. We also agree with each of the courts to consider Williams's cause thus far that the record contains more than ample evidence for a rational jury to find Williams guilty of capital murder beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); see also 679 F.Supp. at 928–29; 652 S.W.2d at 115; 712 S.W.2d at 410. As the Missouri Supreme Court observed, "[t]he fact ... [Brummett] ran into the river to escape his attackers does not alter [Williams's] liability for the death." 652 S.W.2d at 112.

## VI. CONCLUSION

We have examined the record and applicable legal principles with great care. Having done so, we find no error warranting habeas corpus relief. Accordingly, we affirm the district court's denial of Williams's petition.

BRIGHT, Senior Circuit Judge, concurring in part and dissenting in part, with whom McMILLIAN, Circuit Judge, joins.

I must dissent with respect to parts I and II of the majority opinion. In my view, the state trial court's refusal to instruct the jury on first-degree (felony) murder, see Mo.Ann.Stat. § 565.003 (Vernon 1979) (repealed 1984), in this capital case violated due process and equal protection. In substance, I adhere to the views expressed by the majority in the prior panel opinion, which granted Williams partial relief on his habeas petition. Williams v. Armontrout, 891 F.2d 656 (8th Cir.1989). Although the grant of the en banc review serves to vacate the panel opinion, I consider the views expressed therein to be valid. I adopt those views here and expand on the reasoning of that decision.

The majority does not deny the proposition that the Missouri appellate courts, by refusing to adhere to a consistent standard regarding submission of the first-degree murder instruction in capital cases, have violated principles of due process and equal protection. A review of the Missouri case law discloses that (1) the Missouri courts have acted arbitrarily in applying the Baker rule, see State v. Baker, 636 S.W.2d 902, 904–05 (Mo.1982) (en banc), cert. denied, 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983), and (2) that the effect of this arbitrary application has been to affirm convictions.[1] In fact, the Missouri Supreme Court has been accused by its own

---

1. The Missouri Supreme Court's selective application of Baker to affirm convictions is documented as follows.

On August 23, 1982, the Missouri Supreme Court held in Baker, 636 S.W.2d at 904–05, that first-degree murder was not a lesser included offense for capital murders occurring after January 1, 1979. The Missouri Supreme Court initially applied Baker retroactively, thereby affirming three capital murder convictions in which trial courts neglected to give the first-degree murder instruction. See State v. Blair, 638 S.W.2d 739, 746–47 (Mo.1982) (en banc), cert. denied, 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983); State v. Woods, 639 S.W.2d 818, 819 (Mo.1982); State v. Betts, 646 S.W.2d 94, 96 (Mo.1983) (en banc). The Missouri Supreme Court then changed course and held that Baker applied prospectively only. State v. Goddard, 649 S.W.2d 882, 889 (Mo.) (en banc), cert. denied, 464 U.S. 997, 104 S.Ct. 495, 78 L.Ed.2d 689 (1983). This ruling permitted the court to affirm a jury verdict of first-degree murder even though the state had charged only capital murder.

Just four weeks later, the Missouri Supreme Court reversed its position again, this time holding that Baker's retroactive application prohibited instruction on first-degree murder. State v. Williams, 652 S.W.2d 102, 112 (Mo.1983) (en banc). This case affirmed Williams' conviction for capital murder. Shortly after deciding Williams, the Missouri Supreme Court changed positions for the third time that year and affirmed a first-degree murder conviction based on Baker's prospective application. State v. Holland, 653 S.W.2d 670, 673 (Mo.1983) (en banc). Four years later, a Missouri Court of Appeals admitted it could not reconcile the Williams decision with other Missouri case law. Rumble v. State, 741 S.W.2d 283, 284 n. 2 (Mo.Ct.App. 1987).

members of selectively applying the *Baker* standard in order to effect affirmances. *See, e.g., State v. Holland,* 653 S.W.2d 670, 680 (Mo.1983) (en banc) (Welliver, J., dissenting) ("The majority ... has treated similarly situated defendants differently in a transparent effort to avoid granting them new trials."); *State v. Williams,* 652 S.W.2d 102, 117–18 (Mo.1983) (en banc) (Welliver, J., dissenting); *State v. Goddard,* 649 S.W.2d 882, 890–92 (Mo.) (en banc) (Welliver, J., dissenting in an opinion in which Seiler, J., concurred), *cert. denied,* 464 U.S. 997, 104 S.Ct. 495, 78 L.Ed.2d 689 (1983).[2]

The remaining question is whether the facts of Williams' case could support a first-degree murder instruction under Missouri law. *See Hopper v. Evans,* 456 U.S. 605, 610–12, 102 S.Ct. 2049, 2052–53, 72 L.Ed.2d 367 (1982). Under a reasonably fair and consistent construction of Missouri law, the facts of this case warranted instruction on first-degree murder.

In this case, both defense counsel and the prosecutor requested an instruction on first-degree murder. Nevertheless, the state trial court denied the instruction because, in its interpretation of the evidence, the facts of Williams' case could not support an independent kidnapping, *see* Mo. Ann.Stat. § 565.110 (Vernon 1979). Specifically, the state trial court noted,

> [T]he Court does not feel that there is evidence sufficient to submit on the felony murder theory. The reasoning behind that is that in this case the only evidence that I remember in this case is that the defendant, together with one John Morgan, set about with an intent and design to cause the death of the deceased in this case, Kerry Brummett.

The plan was, that is the evidence indicates, if the jury believes it, that they set about to have the aid and assistance of a female, Betty Coleman. And with the eventual intent being that the deceased would be killed and his body thrown in the Missouri River..

The Court feels that the kidnapping that took place later on in the evening was merely one link in the chain of events that had been planned by the defendant and John Morgan in committing the offense of murder.

State Trial Tr. at 613–14. It is this one-sided recitation of the facts that the majority necessarily adopts, *supra* at 929–930, in affirming Williams' conviction.

However, neither the law nor the facts applicable to this case are so clear-cut. Specifically, central to the majority opinion is its assertion, *supra* at 929, that "Missouri would not recognize an abduction that is part and parcel of a premeditated murder plan as a separate kidnapping offense."

The majority's proposition, which appears to require proof of a non-incidental kidnapping, misconstrues the essential elements of a kidnapping charge under Missouri law.[3] In particular, Missouri courts have recognized that some types of kidnapping are, by their nature, incidental. *State v. Jackson,* 703 S.W.2d 23, 24 (Mo.Ct.App. 1985). According to the court in *Jackson,* a kidnapping that is committed for the purpose of facilitating a felony—as was the abduction in the instant case[4]—will "nearly always involve the commission of another offense and to that degree will ... be incidental to the other offense." *Id.* Consequently, the question under Missouri law

**2.** Significantly, both the federal district court and the previous Eighth Circuit panel agreed that due process entitled Williams to the first-degree murder instruction if supported by the evidence. *Williams v. Armontrout,* 679 F.Supp. 916, 924 (W.D.Mo.1988); *Williams v. Armontrout,* 891 F.2d 656, 658–59, 667 (8th Cir.1989) (judgment vacated) (majority opinion of Bright, J., and dissenting opinion of Fagg, J.). In addition, the state trial court reached the same conclusion, although relying on state law grounds. State Trial Tr. at 612–13, 755. Only the Missouri appellate courts have ruled otherwise. *State v. Williams,* 652 S.W.2d at 112; *Williams v. State,* 712 S.W.2d 404, 406, 411 (Mo.Ct.App. 1986). Moreover, at least one other Eighth Circuit panel has expressed concern about the due process implications of the Missouri Supreme Court's vacillating position with respect to sub-

mission of the first-degree murder instruction. *Franklin v. White,* 803 F.2d 416, 418–19 (8th Cir.1986), *cert. denied,* 481 U.S. 1020, 107 S.Ct. 1904, 95 L.Ed.2d 510 (1987).

**3.** Although the majority attempts to imply by its citation form that *State v. Jackson,* 703 S.W.2d 23, 25 (Mo.Ct.App.1985), stands for this proposition, the *Jackson* case dealt with a sexual assault, not a capital murder.

**4.** The jury, during the sentencing phase, found beyond a reasonable doubt that Williams had acted to prevent Brummett from testifying in a judicial proceeding. State Trial Tr. at 702. Tampering with a prospective witness in a felony prosecution is a felony under Missouri law. *See* Mo.Ann.Stat. § 575.270 (Vernon 1979) (amended 1983).

is not whether the *kidnapping* is incidental. Rather, the question is whether the *movement* or *confinement* is incidental—as the Missouri courts have seen fit to define those terms. *Id.* at 24–25.

Traditionally, the Missouri courts have required only a modicum of evidence to support a separate conviction for kidnapping. Indeed, in *State v. Dodson*, 556 S.W.2d 938, 942–43, 946–47 (Mo.Ct.App. 1977), the state obtained convictions for both capital murder and kidnapping where the defendant had confined the victims for only an hour before executing them.[5] Notably, the defendant in *Dodson* did not attempt to contend that the movement or confinement of the victims was insufficient to sustain a separate conviction for kidnapping. Moreover, it is by no means unusual for the Missouri courts to uphold separate kidnapping convictions in cases that present movement or confinement that is comparable to *Dodson*. For example, the Missouri Supreme Court recently upheld separate convictions for kidnapping and armed robbery where a defendant entered a car in a store parking lot, robbed its occupants and then ordered them to transport him a short distance down an access road before effecting his getaway. *State v. Hornbuckle*, 769 S.W.2d 89, 91, 97–98 (Mo.) (en banc), *cert. denied*, — U.S. —, 110 S.Ct. 171, 107 L.Ed.2d 128 (1989).

Likewise, in sexual assault cases, Missouri courts have routinely interpreted the movement or confinement requirement to support separate, additional kidnapping charges. *See, e.g., State v. Erby*, 735 S.W.2d 148, 149 (Mo.Ct.App.1987); *Jackson*, 703 S.W.2d at 24–25. In *Erby*, the Missouri Court of Appeals held that a sexual assault incident could support separate kidnapping charges when the defendant's choice to move the victim greatly facilitated commission of the crime. In *Jackson*, the court held that moving a sexual assault victim to a more secluded spot supported a separate kidnapping charge, even when the new location was only a block away. Both courts reasoned that moving the victim substantially increased the risk of harm because the remoteness and privacy of the location increased the victim's terror, reduced the probability of others witnessing the attack or capturing the defendant and

made the victim's escape more difficult. *Erby*, 735 S.W.2d at 149; *Jackson*, 703 S.W.2d at 25.

The majority would nevertheless require Williams to establish not only non-incidental movement or confinement, but also a non-incidental kidnapping. To this writer's knowledge, however, the Missouri Supreme Court has never directly decided whether a premeditated murder that incidentally involved a kidnapping could support a conviction for first-degree murder. Apparently, the closest the Missouri Supreme Court has come to addressing this issue is *State v. Blair*, 638 S.W.2d 739 (Mo.1982) (en banc), *cert. denied*, 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983). The crucial circumstances of *Blair* resemble those of the instant case. *See id.* at 743–46. In *Blair*, a jail inmate charged with sexual assault hired an acquaintance, Blair, to eliminate the prosecution's key witness. Blair kidnapped the witness and killed her. Blair was thereafter charged with capital murder and convicted. Blair then challenged his capital murder conviction, in part, because the trial court had refused to instruct on first-degree murder based on the kidnapping. The Missouri Supreme Court denied the appeal relying on the *Baker* rationale that first-degree murder was not a lesser included offense. *Id.* at 746–47. In so concluding, however, the Missouri Supreme Court added the following remarks:

> Of course, the state if it chose to charge or seek an indictment of first-degree murder in addition to capital murder, which would allow an instruction on first-degree murder, could do so. Rule 23.05. But such is not the instant case. Nor is this a situation where a defendant charged only with capital murder requests and gets an instruction on first-degree murder, and then is convicted of first-degree murder. The point is overruled.

*Id.* at 747.

The above comments suggest that the Missouri Supreme Court contemplated that the facts of *Blair* could support a first-degree murder conviction. The only reason given for denial is the holding in *Baker*, a basis that is unsound and on which the majority in the instant case does not rely. Hence, given the similarities between

---

5. At the time of the defendant's conviction in *Dodson*, the Missouri statutes defined capital murder as "murder in the first degree." *See Dodson*, 556 S.W.2d at 946 n. 4. For a definition of murder in the first degree and a partial history of Missouri's capital murder provisions, see *State v. Duren*, 547 S.W.2d 476, 477–81 (Mo. 1977) (en banc).

Williams' case and *Blair*, if the instruction might have been given in *Blair*, the majority has no foundation for denying it now to Williams.

It is further noteworthy that the Missouri Supreme Court has reviewed and affirmed cases where defendants received convictions for both capital murder and kidnapping. *See, e.g., Bullington v. Missouri*, 451 U.S. 430, 435 n. 7, 101 S.Ct. 1852, 1856 n. 7, 68 L.Ed.2d 270 (1981), *rev'g on other grounds State ex rel. Westfall v. Mason*, 594 S.W.2d 908 (Mo.1980); *State v. Kilgore*, 771 S.W.2d 57, 59–60, 68–69 (Mo.) (en banc), *cert. denied*, — U.S. —, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989).[6] Significantly, after the United States Supreme Court reversed the judgment in *Bullington*, the state retried the defendant and obtained a conviction for first-degree murder on a kidnapping-based theory. *See State v. Bullington*, 684 S.W.2d 52, 53–54, 57 (Mo.Ct.App.1984).

The Missouri Supreme Court has also affirmed a conviction for first-degree murder where the defendant kidnapped, raped and murdered a victim with seeming deliberation. *State v. Olds*, 603 S.W.2d 501, 502–05, 508–09 (Mo.1980) (en banc). In addition, the Missouri Supreme Court has affirmed a conviction for kidnapping that occurred in the context of an apparent attempted murder, *see State v. Nave*, 694 S.W.2d 729, 731–33, 738–39 (Mo.1985) (en banc) (defendant's foiled attempt to murder drug abuse counselor), *cert. denied*, 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 901 (1986), and in the context of a robbery-based felony murder to which the kidnapping was seemingly incidental, *see State v. Mahaney*, 625 S.W.2d 112, 113 (Mo.1981) (en banc).

Several opinions of the Missouri Court of Appeals likewise support the position that a kidnapping that is incidental to a capital murder can provide the basis for a first-degree murder conviction. In fact, the Missouri Court of Appeals, in discussing the capital murder and kidnapping convictions in *Dodson*, 556 S.W.2d at 947, expressly noted that "the State alleged and proved that the acts of kidnapping and confining the victims were integral parts of a common scheme leading to their murder." Similarly, in *State v. Mondaine*, 655 S.W.2d 540, 544 (Mo.Ct.App.1983), another kidnapping-murder, the Missouri Court of Appeals implicitly approved the submission of a first-degree murder instruction, while at the same time accepting the state's allegation that "the key link in the chain of causation of the victim's death was the kidnapping of the victim." As in *Williams*, the state in *Mondaine* had apparently proceeded on a premeditated murder theory.[7] Also as in *Williams*, the defendant relied predominantly on an alibi defense. *Id.*

Further, in *State v. Jimmerson*, 660 S.W.2d 475, 476–79 (Mo.Ct.App.1983), the Missouri Court of Appeals affirmed a defendant's conviction for capital murder where, following the robbery of a store, the defendant and an accomplice took the clerk to a country road and shot him. In reaching this result, the court acknowledged that the defendant's accomplice was permitted to plead guilty to first-degree murder for the same offense and appeared to concede that the evidence could have supported such a charge. *Id.* at 477–78. Likewise, in *Reed v. State*, 778 S.W.2d 313, 315 (Mo.Ct.App.1989), a defendant who faced charges for capital murder and kidnapping was permitted to enter a plea to first-degree murder and kidnapping. The Missouri Court of Appeals upheld the first-degree murder conviction, although on other grounds. *Id.* at 317–21.

A reasonably consistent application of the above holdings and the standards supplied by *Erby*, 735 S.W.2d at 149, and *Jackson*, 703 S.W.2d at 24–25, indicates that Williams' jury should have received instruction on first-degree murder. The evidence presented at Williams' trial was that Betty Coleman lured Brummett into her car and then drove to a place on State Route 94 known as the "S" curves. State Trial Tr. at 282, 284, 289, 419. The "S" curves were located east of Jefferson City, Missouri, approximately one or two miles from the

---

6. The defendant in *Kilgore* was convicted under Mo.Ann.Stat. § 565.020 (Vernon Supp.1990), which replaced the capital murder provision under which Williams was convicted, *see* Mo. Ann.Stat. § 565.001 (Vernon 1979) (repealed 1984).

7. Specifically, the state presented evidence that the defendant, a drug lord, kidnapped and killed the victim, a suspected drug thief, as a lesson to others. *Mondaine*, 655 S.W.2d at 541–44. Thereafter, the trial court submitted instructions on capital murder, first-degree murder, second-degree murder and manslaughter. *Id.* at 544. The jury returned a verdict of second-degree murder. *Id.* at 541.

Missouri River. *Id.* at 284. At the "S" curves, Coleman pulled off the blacktop onto a gravel road and stopped the car. *Id.* at 288–89. At this time, the car containing Brummett was located only fifteen to twenty feet from the highway. *Id.* at 289.

Significantly, Morgan and Williams did not summarily execute Brummett at this location and then transport him to the river bank. Moreover, they did not kill Brummett at this location even though both Williams and Morgan were armed and Brummett strenuously resisted the abduction. *See* State Trial Tr. at 289–91. Instead, Williams and Morgan forcibly removed Brummett from the vehicle, tackled him to the ground, wrestled him into handcuffs and then placed him in the trunk. *Id.* Williams and Morgan then proceeded down the gravel road toward the Missouri River. *Id.* at 291. When they found campers at their planned place of entry, they turned around and headed back for the highway. *Id.*

On the way back to the highway, Williams and Morgan stopped the car and conducted a search of the trunk for a pistol that they mistakenly believed had fallen in the trunk during the abduction. State Trial Tr. at 292. Brummett was alive and conscious at this time. *Id.* The captors then stopped again at the site of the abduction, where they apparently continued the search for the missing weapon and ultimately recovered it. *Id.* at 292–93.

From there, Williams and Morgan turned onto State Route 94 and drove an additional five to six miles east toward Tebbetts, Missouri. State Trial Tr. at 293. Just outside of Tebbetts, the captors turned off the highway again and proceeded an undetermined distance to an isolated point on the Missouri River. *Id.* at 293, 304–13. Brummett's attempt to escape ensued shortly thereafter. *Id.* at 294.

The majority suggests that the purpose behind transporting Brummett was solely to facilitate disposal of his body. This explanation is insufficient in itself, however, because Brummett, alive and struggling, certainly presented more of a difficulty than a corpse. Likewise, as subsequent events made obvious, the living Brummett presented a far greater escape risk. Finally, the availability of cliffs and steep banks at various points along the Missouri River would have made disposal of Brummett's body relatively simple had that been the captors' intent, regardless of where the actual killing occurred.

In view of the above evidence, only two reasonable explanations exist for Williams' and Morgan's decision to transport Brummett alive. The first explanation is that Williams and Morgan, although ultimately intending to kill Brummett, chose to transport Brummett in order to facilitate the commission of the crime as defined in *Erby,* 735 S.W.2d at 149, and *Jackson,* 703 S.W.2d at 24–25. In other words, Williams and Morgan were seeking a secluded location in order to minimize the opportunities for detection or intervention by outsiders and to decrease the chance that Brummett would successfully resist them.

A fair portion of the evidence introduced at trial lends credence to this position. For example, under one view of the evidence, the conspirators consciously rejected a proposal to kill Brummett at Betty Coleman's trailer because of the likelihood of detection by Coleman's roommate. State Trial Tr. at 283–85. Moreover, Williams and Morgan twice transported Brummett away from a travelled roadway in search of a site for the killing, *id.* at 291, 293, and deliberately rejected one location after discovering people in the vicinity, *id.* at 294.

The second possibility is that Williams and Morgan never intended to kill Brummett but only to terrify him into maintaining silence at the upcoming court proceedings. If this had been the case, the facts would clearly warrant a first-degree murder instruction because Brummett's death resulted only when, due to the attempted escape, the kidnapping went amok.

This theory is not so far-fetched as the majority's recitation of the facts attempts to suggest. Indeed, the sole support in the record for the majority's factual assertions about Williams' conduct at the scene of the crime, *supra* at 927–928, 929–930, is the testimony of John Morgan, a co-conspirator turned State's witness. Morgan, however, testified in exchange for his life. *See* State Trial Tr. at 318. Consequently, while Morgan's testimony, if believed in its entirety, may suggest that Williams acted with premeditation, Morgan's status as an accomplice entitled the jury to believe all, some or none of his assertions. *State v. Day,* 719 S.W.2d 291, 291–92 (Mo.Ct.App.1986); *State v. Dick,* 636 S.W.2d 425, 427 (Mo.Ct.App.1982).

Further, the defense presented considerable evidence impeaching Morgan. The defense developed Morgan's own interest in Brummett's death, State Trial Tr. at 320–21, 350, 632–33, as well as Morgan's incen-

tive for providing the prosecution with information that would merit a grant of immunity, *id.* at 318–19, 350–51, 629–30, 633. In addition, the defense called into question the essential reliability of Morgan's statements by eliciting testimony on Morgan's chronic drug abuse, *id.* at 344–47, 352, 632, and by pointing to numerous inconsistent statements that Morgan had made to police in recounting the events preceding Brummett's death, *id.* at 322–29, 633. Hence, the jury could have found that Morgan exaggerated or distorted Williams' misconduct to improve his own bargaining position.[8]

The jury, not the judge, had the task of resolving these issues. In this case, the trial judge could not assess the evidentiary support for a kidnapping-based first-degree murder instruction without first deciding questions of credibility and state of mind. Since the reasonable minds could have drawn differing inferences about Morgan's credibility and Williams' state of mind, these questions should have rested with the jury. *See State v. Nelson*, 674 S.W.2d 220, 224 (Mo.Ct.App.1984). Thus, under either view of the evidence, a consistent application of Missouri law would dictate in favor of submitting the first-degree murder instruction.

The singular authority in support of the majority's contentions to the contrary is *State v. Coleman*, 660 S.W.2d 201, 208–10 (Mo.Ct.App.1983). *Coleman* presented an appeal by Betty Coleman, Williams' alleged co-conspirator in the instant case. Like Williams, Coleman was convicted of capital murder by a jury that had received no instruction on first-degree murder. When Coleman raised this issue on direct appeal, the Missouri Court of Appeals held that the facts of Coleman's case supported only an intentional planned homicide and not an accidental murder resulting from an independent kidnapping. *Id.* at 209–10. Accordingly, under some and perhaps most circumstances, a federal court might conclude that concepts of federalism, which require certain deference to the *Coleman* holding, are dispositive. Nevertheless, such deference is not warranted in Williams' case for a number of reasons.

First, in *Coleman*, defense counsel explicitly declined the first-degree murder instruction, and the state apparently did not request it either. *Id.* at 209.

Second, the Missouri Supreme Court's failure to adhere to a consistent rule with respect to the first-degree murder instruction forced the Missouri Court of Appeals in *Coleman* to guess at the controlling legal standard for deciding that case. *Id.* The *Coleman* court is not the only Missouri Court of Appeals to express uncertainty about the Missouri Supreme Court's "seemingly inconsistent position" on the first-degree murder instruction. *See Rumble v. State*, 741 S.W.2d 283, 284 n. 2 (Mo. Ct.App.1987);[9] *see also Jensen v. State*, 723 S.W.2d 421, 423–24 (Mo.Ct.App.1986).

What is more, the Missouri Court of Appeals' opinion in *Coleman* may itself present a denial of equal protection, albeit derivatively. To elaborate, the Missouri Court of Appeals rested its conclusion that Betty Coleman's case contained no independent kidnapping, in part, on a comparison of Coleman's circumstances with the Missouri Supreme Court's ruling in *State v. Blair*, 638 S.W.2d at 743–47. Notably, *Blair* is one of the very cases in which, according to Williams' allegations, the Missouri Supreme Court acted arbitrarily to affirm a conviction.

Third, the Missouri Court of Appeals' holding in *Coleman* is insufficient to satisfy the unique federal constitutional concerns that are implicated in death penalty cases. Williams' case, unlike *Coleman*, presents a death penalty appeal.[10] In death penalty cases, Missouri law requires the Missouri Supreme Court to review all of a defendant's contentions on direct appeal. Mo.Ann.Stat. § 565.014.2, .7 (Vernon 1979) (repealed 1984). Missouri adopted this and a number of similar procedural safeguards in order to address the federal constitutional concern that states not impose the death penalty in an arbitrary or capricious manner. *See Bullington*, 451 U.S. at 432–33, 101 S.Ct. at 1854–55; *State v. Mercer*, 618 S.W.2d 1, 4–5 (Mo.) (en banc), *cert. denied*, 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981).

---

**8.** See the vacated panel opinion, *Williams v. Armontrout*, 891 F.2d at 661–63, for additional factors that would support a first-degree murder instruction in Williams' case.

**9.** An Eighth Circuit panel recently denied Rumble's petition for habeas corpus. *See Rumble v. Smith*, 905 F.2d 176 (8th Cir.1990).

**10.** The jury sentenced Coleman to life imprisonment without the possibility of parole for 50 years. *Coleman*, 660 S.W.2d at 204.

These protections, which guard against standardless infliction of the death penalty, are mandatory rather than optional. *See Godfrey v. Georgia,* 446 U.S. 420, 427–28, 100 S.Ct. 1759, 1764–65, 64 L.Ed.2d 398 (1980). In *Godfrey,* the United States Supreme Court overturned a death sentence where the Georgia Supreme Court abdicated its statutorily-mandated duty to provide meaningful review. *Id.* at 428–33, 100 S.Ct. at 1764–67. Accordingly, because the Missouri death penalty scheme was patterned after Georgia's, *Mercer,* 618 S.W.2d at 4–5, the same concerns for fundamental fairness required the Missouri Supreme Court to meaningfully review Williams' contention that the trial court erred in refusing to submit the first-degree murder instruction.

The Missouri Supreme Court, however, addressed the issue of instruction on first-degree murder only cursorily. In fact, the Missouri Supreme Court, in dismissing Williams' claim, relied solely on its prior holding in *Baker, see State v. Williams,* 652 S.W.2d at 112, a basis on which the majority in the instant case has opted not to rely. As a result, the Missouri Supreme Court has never reached the issue that the majority decides today, *i.e.,* that the facts of Williams' case could not warrant an instruction on first-degree murder under Missouri law. Because such a holding fails to comport with the requirements of due process or equal protection in a capital case, I would reverse Williams' death sentence and remand this case to grant Williams relief under his petition unless the Missouri courts grant him a new trial or resentence him to a term of imprisonment. *See* Mo.Ann.Stat. § 565.016 (Vernon 1979) (repealed 1984).[11]

Before LAY, Chief Judge, BRIGHT, Senior Circuit Judge, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN, MAGILL, and BEAM, Circuit Judges, En Banc.

## ORDER

Oct. 12, 1990.

The NAACP Legal Defense and Educational Fund, American Civil Liberty Union of Western Missouri, and Missouri Capital Punishment Resource Center have moved for permission to file briefs in support of Williams's petition for rehearing en banc. For the most part, their briefs address Williams's claim that the Missouri Supreme Court has committed equal protection violations in murder cases. Because we held there was insufficient evidence in Williams's case to justify the submission of an instruction on the lesser included offense of felony murder, we did not reach the merits of Williams's equal protection claim. Thus, the equal protection arguments the moving parties assert in their briefs are irrelevant to our decision and add no support to Williams's petition. *See Williams v. Armontrout,* 912 F.2d 924, 929–30 (8th Cir.1990). Further, we see no useful purpose in permitting the movants to file their briefs. This is particularly so because the equal protection issue raised in the moving parties' briefs was recently decided by this court in another case. *See Blair v. Armontrout,* Nos. 86–2375/2376 (8th Cir. Sept. 24, 1990).

The motions are denied.

LAY, Chief Judge, dissenting.

I would allow the filing of the amicus briefs. Having considered the same, I reaffirm my vote to deny the petition for rehearing.

BRIGHT, Senior Circuit Judge, dissenting.

I join paragraphs one and two of Judge Arnold's dissent which follows my statement. The judges have read the briefs in question. Thus, in addition to what Judge Arnold has written, I see no basis for rejecting their filings. Furthermore, the amici briefs support the dissent of this writer and Judge McMillian. Therefore, I believe these amici briefs have merit.

I must note that *Blair v. Armontrout* cited by the majority's order does not dispose of the equal protection issue. That panel decision does not bind an en banc court.

Finally, although I disagree with the majority's decision on the merits in this case, I nevertheless do not vote for a rehearing en banc inasmuch as all issues seem to have had consideration by the court and a rehearing will not accomplish any changing of views by the majority.

---

11. Even if relief were granted, Williams would likely spend the rest of his life in prison under his conviction for a separate homicide. *See*

*Williams v. Armontrout,* 877 F.2d 1376, 1377 (8th Cir.1989) (Bright, J.), *cert. denied,* — U.S. ——, 110 S.Ct. 1140, 107 L.Ed.2d 1044 (1990).

ARNOLD, Circuit Judge, with whom JOHN R. GIBSON, Circuit Judge, joins, dissenting.

I respectfully dissent. In my view, we should grant the three pending motions for leave to file briefs amicus curiae. This is a death case. Such cases command our attention and careful study in a unique way. Life—anyone's life—is a transcendent value, and there is no graver or more important judicial function than deciding matters of life and death. In this situation, we ought not close our ears to any responsible voices, whether or not we agree with what they are saying.

Here, the voices are unquestionably responsible. The NAACP Legal Defense and Educational Fund, the American Civil Liberty Union of Western Missouri, and the Missouri Capital Punishment Resource Center all have substantial experience and expert knowledge in the field of death-penalty law. We are not required to accept their arguments on the merits, but we should give them respectful consideration. Refusing them leave even to file briefs is inconsistent with this duty.

I have read each of the briefs which the Court today refuses to consider. They have not persuaded me to change my mind on the merits. The Court en banc has held, with ample support in Missouri law, that there was insufficient evidence to justify the submission of a felony-murder instruction. Accordingly, Williams cannot prevail on this issue, whatever backings and fillings the Missouri Supreme Court might have engaged in in order to preserve judgments in criminal cases. Thus, I agree with the Court that the petition for rehearing en banc should be denied, but I would take this action only after allowing the amicus briefs to be filed.